Steven SOUTH and Linda South, derivatively on behalf of Hecla Mining Company, Plaintiffs,

v.

Phillips S. BAKER, Jr., John H. Bowles, Ted Crumley, George R. Nethercutt, Jr., Terry V. Rogers, Charles B. Stanley, and Anthony P. Taylor, Defendants,

and

Hecla Mining Company, a Delaware Corporation, Nominal Defendant.

C.A. No. 7294–VCL.

Court of Chancery of Delaware.

Submitted: Aug. 3, 2012.

Decided: Sept. 25, 2012.

Blake A. Bennett, Cooch & Taylor P.A., Wilmington, Delaware; Nicholas I. Porritt, Eduard Korsinsky, Thomas M. Gottschlich, Levi & Korsinsky, LLP, New York, New York; Attorneys for Plaintiffs.

William M. Lafferty, Shannon E. German, Angela C. Whitesell, Morris Nichols Arsht & Tunnell LLP, Wilmington, Delaware; Warren R. Stern, José L. Miñán, Wachtell, Lipton, Rosen & Katz, New York, New York; Attorneys for Defendants.

William M. Lafferty, Shannon E. German, Angela C. Whitesell, Morris Nichols Arsht & Tunnell LLP, Wilmington, Delaware; Mark Filip, Robert J. Kopecky, John F. Hartmann, P.C., Joshua Z. Rabinovitz, Kirkland & Ellis LLP, Chicago, Illinois; Attorneys for Nominal Defendant.

## OPINION

LASTER, Vice Chancellor.

In January 2012, Hecla Mining Company ("Hecla" or the "Company") issued a press release lowering its projections for silver production, and the United States Mine Safety and Health Administration ("MSHA") issued a press release noting

that Hecla had been cited for numerous safety violations. Within weeks, two lawsuits alleging violations of the federal securities laws were filed in Idaho federal court. In this action, Steven and Linda South, alleged holders of an unidentified number of Hecla shares, have sued derivatively to recover on behalf of Hecla the damages that the Company has suffered and will suffer from the federal securities actions and the safety violations.

The Souths have invoked the legal theory first recognized by Chancellor Allen in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del.Ch. 1996). As developed in subsequent cases and endorsed by the Delaware Supreme Court in *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del.2006), directors can be held liable under this theory for knowingly causing or consciously permitting the corporation to violate positive law, or for failing utterly to attempt to establish a reporting system or other oversight mechanism to monitor the

corporation's legal compliance. Because a plaintiff asserting a *Caremark* claim must plead facts sufficient to establish board involvement in conscious wrongdoing, our Supreme Court has admonished stockholders repeatedly to use Section 220 of the General Corporation Law, 8 *Del. C.* § 220, to obtain books and records and investigate their claims before filing suit.[1]

The Souths did not heed this advice, and the defendants moved to dismiss their cursory complaint pursuant to Rule 23.1 for failure to make demand or adequately plead demand futility. The motion is granted, and the complaint is dismissed "with prejudice and without leave to amend as to the named plaintiff." *King v. VeriFone Hldgs., Inc.*, 12 A.3d 1140, 1151 (Del.2011); *cf.* Ch. Ct. R. 15(aaa).

As discussed below, uncertainty exists about the degree to which a with-prejudice dismissal of one stockholder's lawsuit could have preclusive effect on the litigation efforts of other stockholders. There is a

---

1. *See, e.g., Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1056 (Del.2004) ("Both this Court and the Court of Chancery have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a Section 220 books and records inspection to uncover such facts."); *White v. Panic*, 783 A.2d 543, 556–57 (Del. 2001) ("[T]his case demonstrates the salutary effects of a rule encouraging plaintiffs to conduct a thorough investigation, using the 'tools at hand' including the use of actions under 8 *Del. C.* § 220 for books and records, before filing a complaint.... [F]urther pre-suit investigation in this case may have yielded the particularized facts required to show that demand is excused or it may have revealed that the board acted in the best interests of the corporation." (footnote omitted)); *Brehm v. Eisner*, 746 A.2d 244, 266–67 (Del.2000) (disregarding plaintiffs' complaint "that the system of requiring a stockholder to plead particularized facts in a derivative suit is basically unfair because the Court will not permit discovery under Chancery Rules 26–37 to mar-

shal the facts necessary to establish that presuit demand is excused" and reasoning that "[p]laintiffs may well have the 'tools at hand' to develop the necessary facts for pleading purposes ... [by] seek[ing] relevant books and records of the corporation under Section 220"); *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 79 (Del.1997) ("[P]laintiffs inexplicably did not bring [a Section 220 action before filing their derivative complaint]. Accordingly, plaintiffs cannot argue that they have used the available 'tools at hand to obtain the necessary information before filing a derivative action.'" (quoting *Grimes v. Donald*, 673 A.2d 1207, 1216 (Del.1996))); *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 n. 3 (Del.1997) ("This Court has encouraged the use of Section 220 as an information-gathering tool in the derivative context, provided a proper purpose is shown." (internal quotation marks omitted)); *Rales v. Blasband*, 634 A.2d 927, 934 n. 10 (Del.1993) (expressing surprise at the rarity with which Section 220 had been used to gather information to satisfy Court of Chancery Rule 23.1).

broad consensus, however, that a with-prejudice dismissal does not have preclusive effect if the initial plaintiff failed to provide adequate representation for the corporation. Concerned about the Souths' efforts, I requested supplemental briefing on the adequacy question. Having considered the parties' arguments, I find that the Souths and their counsel failed to provide adequate representation for Hecla. The dismissal of their complaint therefore should not have preclusive effect on the efforts of more diligent stockholders to investigate potential claims and, if warranted, file suit.

## I. FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' verified stockholder derivative complaint and the documents it incorporates by reference.

## A. Hecla Mining Company

Hecla is a Delaware corporation headquartered in Coeur d'Alene, Idaho. Its shares trade publicly on the New York Stock Exchange under the symbol "HL." Hecla engages in the discovery, acquisition, development, production, and marketing of precious and base metals such as silver, gold, lead, and zinc. The Company owns and operates two mines: the Greens Creek mine located on Admiralty Island, Alaska, and the Lucky Friday mine located in the Coeur d'Alene Mining District in northern Idaho. In 2010, production from the Greens Creek mine contributed $313.3 million in revenue, representing 75% of Hecla's consolidated sales; production from the Lucky Friday mine contributed $105.5 million in revenue, representing 25% of Hecla's consolidated sales.

Hecla's board of directors (the "Board") has seven members. One is the Company's CEO. The others are non-management directors whose status as independent outsiders is not meaningfully challenged. Each has impressive experience and qualifications beneficial to a mining company and inconsistent with the complaint's premise of uncaring directors who consciously disregarded their duties.

- John Bowles has served as a director since 2006. He is a Fellow of the Canadian Institute of Mining and Petroleum and has served as a director for two other mining companies, Boss Power Corp. and HudBay Minerals, Inc. He chairs the Audit Committee and is a member of the Executive Committee. Compl. ¶ 12.

- Terry Rogers has served as a director since 2007. He is a former Chief Operating Officer of Cameco Corporation, "one of the world's largest uranium producers," and former president of Kumtor Operating Company, a gold producer. He is a member of the Audit Committee and the Compensation Committee. *Id.* ¶ 15.

- Charles Stanley has served as a director since 2007. Over the past ten years, he has held senior executive positions at Questar Corporation and QEP Resources, Inc., both exploration and production companies focused on natural gas. He is a member of the Audit Committee and the Corporate Governance/Directors Nominating Committee. *Id.* ¶¶ 11, 16.

- Anthony Taylor has served as a director since 2002. He has held senior executive positions at Crown Gold Corporation (an exploration company), Gold Summit Corporation (a public minerals exploration company), and Millennium Mining Corporation (a minerals exploration company). He chairs the Corporate Governance/Directors Nominating Committee and is a member of the Compensation Committee. *Id.* ¶ 17.

- George Nethercutt has served as a director since 2005. Since 2007, he has been a principal of Nethercutt Consulting LLC, a strategic planning and consulting firm, and Of Counsel to Lee & Hayes PLLC, a law firm. He serves on the boards of ARCADIS Corporation and the Juvenile Diabetes Research Foundation International. From April 2005 to December 2009, he served as U.S. Chairman of the Permanent Joint Board on Defense—U.S./Canada. From 1995 to 2005, he was a member of the U.S. House of Representatives where he served at various times as a member of the Subcommittee on Interior, Agriculture and Defense Appropriations, a member of the Committee on Science and Energy, and as Vice Chairman of the Defense Subcommittee on Appropriations. He chairs the Compensation Committee and is a member of the Corporate Governance/Director Nominating Committee. *Id.* ¶ 14.
- Ted Crumley has served as a director since 1995. Before retiring in 2005, he was the Executive Vice President and Chief Financial Officer of OfficeMax, Inc. He is a member of the Compensation Committee and the Executive Committee. *Id.* ¶ 13.
- Phillips Baker is Hecla's CEO and has served as a director since 2002. He is currently a director of QEP Resources and is a former director of Questar Corporation, both exploration and production companies focused on natural gas. *Id.* ¶ 11.

In addition to the qualifications and roles described above, the four outside directors with the most mining industry experience (directors Bowles, Rogers, Stanley, and Taylor) serve on the Board's Health, Safety, Environment & Technical Committee (the "Safety Committee"). *Id.* ¶¶ 12, 21. According to its charter, the responsibilities of the Safety Committee include (i) reviewing health, safety and environmental policies; (ii) discussing annually with management the scope and plans for conducting audits of the Company's performance in health and safety; (iii) reviewing and discussing with management any material noncompliance with health or safety laws and management's response to such noncompliance; and (iv) receiving and reviewing updates from management regarding the Company's health and safety performance. *Id.* The Safety Committee's existence and mandate are likewise inconsistent with the complaint's central premise of intentionally indolent directors.

## B. The April 2011 Rock Fall

During 2011, Hecla experienced a series of incidents at the Lucky Friday mine. On April 15, a rock fall occurred more than a mile below the surface where two Hecla employees were working. *Id.* ¶ 30. MSHA conducted an investigation and issued a report on November 17 (the "MSHA Report"). The complaint cites liberally to and quotes from the MSHA Report, thereby incorporating it by reference.

The first, unnumbered page of the MSHA Report bears the heading "Overview" and summarizes MSHA's findings. It states:

> On April 15, 2011, Larry Marek, miner, age 53, was killed while watering down a muck pile in a stope. A rock fall approximately 90 feet long, 20 feet wide, and 30 feet high struck him.
>
> The accident occurred because management did not have policies and procedures that provided for safe mining of split stopes in a multi-vein deposit. Management failed to design, install, and maintain a support system to control the ground in places where miners worked and traveled. Additionally,

management failed to ensure that appropriate supervisors or other designated persons examined or tested the ground conditions where the fall occurred.

The body of the MSHA Report amplifies the "Overview" with a "Root Cause Analysis" that identifies both management's shortcomings and the corrective action taken.

Root Cause: Management did not conduct an evaluation, engineering analysis, or risk assessment to determine the structural integrity of the stope back. The back that struck the victim was comprised of a combination of paste fill and waste pillar. As shown on projection maps, geologic structure in the form of joints, faults, and fractures intersected the waste pillar at various angles. These intersecting discontinuities cut the pillar rock mass into angular blocks and wedges which facilitated gravity failure. The large blocks and wedges observed in the fall rubble were not sufficiently supported by the 6-foot long rock bolts installed in the undercut surface of the waste pillar.

Corrective Action: Management developed and implemented new ground control standards that prohibit mining under intervening waste pillars and also established a maximum stope width. Management trained miners regarding these new standards.

Root Cause: Management policies, procedures, and controls failed to ensure appropriate supervisors or other designated persons examined and tested ground conditions to determine if additional ground control measures needed to be taken to ensure the safety of miners prior to commencing work in the stope.

Corrective Action: Management developed and implemented new ground control standards that include guidance on who is responsible for examining and testing the ground conditions. Management trained miners regarding these new standards.

MSHA Report at 6–7. The complaint relies heavily on the MSHA Report's references to "management," a term the Report uses to refer to the "principal operating officials" for the Lucky Friday mine: Phil Baker, CEO; John Jordan, Vice–President; and Scott Hogamier, Safety Coordinator. *Id.* at 1. The complaint does not articulate how director action or conscious inaction led to the injuries suffered in the April 2011 rock fall.

## C. The November 2011 Incident At The # 4 Shaft

In a sad coincidence, a second accident occurred on November 17, 2011, the same day the MSHA Report issued. Hecla was constructing a new internal shaft, known as the # 4 Shaft, to provide deeper access at the Lucky Friday mine. Compl. ¶ 33. According to Hecla's press release,

[t]wo contractors were involved in the accident during routine activities involving the construction of a 16-foot diameter underground rock bin (a storage area for broken rock). The work involved drilling, blasting, and mucking of rock into a previously constructed area. Both men were believed to be wearing all required personal protection equipment, including fall protection. For reasons that are unknown at this time, the two men were drawn into material that was moving underneath them. Both contractors were removed from the area and transported to the hospital, and one has been released.

*Id.* One of the contractors later died from his injuries. *Id.* ¶ 34.

Hecla immediately stopped mining operations to focus on emergency response and to facilitate an MSHA investigation. *Id.*

Due to the seriousness of the accident, MSHA issued a Section 103(j) order. *Id.* According to MSHA's Program Policy Manual, Interpretation and Guidelines on Enforcement of the 1977 Act,

> [i]n the event of a mine accident where rescue and recovery work is necessary, Section 103(j) of the Act grants the authorized representative broad authority to take whatever action, including the issuance of orders, that the representative deems appropriate to protect the life of any person. Where appropriate, the authorized representative(s) may supervise and direct the rescue and recovery activity.

MSHA Program Policy Manual, Volume 1, Interpretation and Guidelines on Enforcement of the 1977 Act, 103(j) Mine Accident and Rescue, Recovery and Preservation of Evidence (May 16, 1996), http://www.msha.gov/regs/complian/ppm/PMVOL1B.HTM (last visited September 25, 2012). The complaint does not allege any connection between the accident at the #4 Shaft and the earlier April 2011 incident. The complaint does not articulate how director action or conscious inaction led to the injuries suffered at the #4 Shaft.

### D. The December 2011 Rock Burst

On December 14, 2011, a rock burst at the Lucky Friday mine injured seven miners. A rock burst is "a sudden and violent failure of overstressed rock resulting in the instantaneous release of large amounts of accumulated energy." 30 C.F.R. § 57.2. "This violent release of energy has been observed on a scale ranging from the expulsion of small rock fragments to the collapse of the excavation. Rockbursts are often observed to follow enlargement of the cavity by blasting and appear to be more frequent in rocks which are hard and brittle." J.P. Bardet, *Finite Element Analysis of Rockburst as Surface Instabil-*

*ity,* 8 Computers & Geotechnics 177, 177–78 (1989).

> [W]hen a rockburst occurs in a mine, there is a sudden concussion which can be felt even on the surface and, in some cases, for several miles.... [I]n the vicinity of the burst, timbers are crushed like match sticks, ... rock flies from the face of the underground openings affected and ... whole sections of the mine may have these openings more or less completely closed by debris.... [R]ock bursts upward from the floor quite as often as it bursts in from the sides or down from the roof of a tunnel or drift.

Ernest A. Hodgson, *What is a Rockburst?,* 38 J. Royal Astronomical Soc'y Can. 1, 2 (1944).

On December 15, 2011, Hecla issued a press release explaining that "[t]he incident occurred at 5900 feet below the surface. Seven people were transported to local hospitals and treated for non-life-threatening injuries. No mine blasting had taken place anywhere in the mine for the previous 24 hours; therefore, the rock burst [was] unrelated to mining activities." Compl. ¶ 35. The complaint does not allege any connection between the rock burst, the November 2011 accident at the #4 Shaft, or the April 2011 incident. Although the complaint alleges that "[t]his shareholder derivative action arises from the harm done to Hecla by the Board when their conscious disregard of their fiduciary duties resulted in the December 14, 2011 rock burst," *id.* ¶ 5, that statement is scientifically impossible and literally untrue. The complaint does not otherwise allege how director action or conscious inaction led to the injuries suffered in the December 2011 rock burst.

Hecla closed the Lucky Friday mine after the rock burst. On December 21, 2011, Hecla announced that it would construct a 750–foot bypass shaft in lieu of

repairing the area where the rock burst occurred. Despite this setback, the Company projected that its silver production would remain steady at more than 9 million ounces for 2011. Hecla projected that silver production would increase to more than 9.5 million ounces for 2012, even though constructing the bypass shaft would stop silver production from the Lucky Friday mine for two months.

### E. The January 2012 Closure Of The Silver Shaft

On January 11, 2012, Hecla issued a press release announcing that MSHA had ordered the Company to close the Silver Shaft, the primary access to the Lucky Friday mine, pending removal of sand and concrete material that had built up over a number of years. Hecla expected compliance to take at least through the end of 2012 and to delay completion of the bypass shaft. Hecla lowered its estimated silver production for 2012 to 7 million ounces. The complaint does not allege any connection between the closure of the Silver Shaft, the December 2011 rock burst, the November 2011 accident at the # 4 Shaft, or the April 2011 incident. The complaint does not articulate how director action or conscious inaction led to the buildup of sand and concrete.

On January 25, 2012, MSHA issued a press release describing the results of inspections conducted by MSHA in December 2011. Compl. ¶ 38. The press release noted that MSHA had issued 59 citations and 15 orders to Hecla in connection with the December 2011 rock burst. *Id.* According to the press release,

> [a]mong the violations cited was a repeated failure to maintain established ground support systems throughout the mine. In addition, ground support fixtures in several areas had not been installed or torqued properly; shafts had not been systematically inspected, tested and maintained, and steel structures in the shaft were not kept clean of hazardous materials; multiple areas of the mine had not been provided with two separate escapeways; explosives magazines had not been constructed and located to protect miners from the risk of unintended explosions; underground shop doors were improperly constructed to ensure fire protection; elevated walkways in multiple areas were not provided with substantially constructed handrails; and travel areas were not kept clean and orderly, resulting in slip, trip and fall hazards.

*Id.* The MSHA release stated that the agency would "continue to use all the enforcement tools at [MSHA's] disposal to combat non-compliance." *Id.*

### F. Procedural History

The January 2012 press releases by Hecla and MSHA started a race to the courthouse. On February 1, a week after the MSHA press release, the first of two securities class actions was filed in the United States District Court for the District of Idaho. The complaints allege violations of Rule 10b–5, 17 C.F.R. § 240.10b–5, and contend that Hecla's disclosures about its safety procedures were materially misleading.

Seven stockholder derivative actions followed. On February 23, 2012, a stockholder derivative action captioned *Cygan v. Crumley,* No. CV–2012–1506, was filed in Idaho state court. On February 29, two stockholder derivative actions, captioned *Hesley v. Baker,* No. 2:12–cv–97, and *Moss v. Baker,* No. 2:12–cv–98, were filed in Idaho federal court. On March 1, Steven and Linda South filed their derivative action in this Court. On March 9, two more derivative actions were filed, one in Idaho state court captioned *Murguia v. Crumley,*

No. CV–2012–1959, and another in Idaho federal court captioned *Adams v. Baker*, No. 2:12–cv–119. On May 24, another derivative action was filed in Idaho state court captioned *McCoy v. Baker*, No. CV–2012–3908.

Like this case, the other six derivative actions assert *Caremark* claims in an effort to hold the Hecla directors liable for any losses suffered by Hecla. Like the Souths, none of the other derivative plaintiffs used Section 220 before filing suit. Hecla has represented, however, that two different stockholders did serve Section 220 demands rather than filing suit. Hecla produced documents in response to the first request on May 1 and is currently in the process of addressing the second demand.

Facing seven competing derivative lawsuits in three different jurisdictions, the defendants sought to distill from the chaos some degree of procedural order. The three stockholder derivative actions in Idaho federal court were consolidated and stayed pending resolution of motions to dismiss in the federal securities actions. A

motion to consolidate the three derivative actions in Idaho state court was filed and remained pending at the time of oral argument in this case. Here, the defendants moved to dismiss pursuant to Rule 23.1.

After reviewing the Souths' complaint and considering the Rule 23.1 briefing, I questioned whether the plaintiffs and their counsel had represented the corporation adequately when rushing to file suit. Recent decisions by this Court have suggested a presumption that when a stockholder hastily files a *Caremark* claim after the public announcement of a corporate trauma, in an effort to shift the still-developing losses to the corporation's fiduciaries, but without first conducting a meaningful investigation, the plaintiff has not adequately represented the corporation.[2] Although a trial court can grant a Rule 23.1 motion with prejudice and without leave to amend as to the named plaintiff, good faith disagreements exist about whether other stockholders of the corporation are in privity with the named plaintiff such that the with-prejudice dismissal has preclusive effect on other derivative actions.[3] Deci-

**2.** *See La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 335–36 (Del.Ch.2012) (appeal pending) [hereinafter *Allergan* ]; *Baca v. Insight Enters., Inc.*, 2010 WL 2219715, at *5 (Del.Ch. June 3, 2010); *King v. VeriFone Hldgs., Inc.*, 994 A.2d 354, 364 n. 34 (Del.Ch. 2010) ("*King I* "), *rev'd on other grounds*, 12 A.3d 1140 (Del.2011) ("*King II* ").

**3.** For decisions from other jurisdictions, compare, for example, *In re Sonus Networks, Inc. S'holder Deriv. Litig.*, 499 F.3d 47 (1st Cir. 2007) (giving preclusive effect to a Rule 23.1 dismissal) and *Henik ex rel. LaBranche & Co. v. LaBranche*, 433 F.Supp.2d 372 (S.D.N.Y. 2006) (same) with *Kaplan v. Bennett*, 465 F.Supp. 555 (S.D.N.Y.1979) (declining to give preclusive effect to a Rule 23.1 dismissal) and *Ex parte Capstone Dev. Corp.*, 779 So.2d 1216 (Ala.2000) (same). For decisions from this Court, compare *In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203 (Del.Ch. Sept. 28, 2007) (giving preclusive effect to a Rule 23.1

dismissal) with *Allergan*, 46 A.3d at 323 (declining to give preclusive effect to a Rule 23.1 dismissal). A third decision from this Court argued for a middle ground in which preclusion would turn on whether the later-filing plaintiff obtained additional information and made significantly new allegations:

> Equitable considerations render dubious the majority position [endorsing preclusion] on this issue. Preventing subsequent individual plaintiffs from bringing potentially meritorious suits based on additional information gained in a section 220 demand would undercut the purpose of the statute and the policy concern articulated by the Delaware Supreme Court that plaintiffs should employ Section 220 before filing suit. While a prior suit by another plaintiff with similar allegations of demand futility may bar a second plaintiff from filing the same suit, if the second plaintiff makes substantially different allegations of demand futility, based on additional information, is-

sions that give preclusive effect to a Rule 23.1 dismissal universally recognize that another stockholder still can sue if the first plaintiff provided inadequate representation.[4] Because of uncertainty over the potentially preclusive effect of a Rule 23.1 dismissal, I asked the parties to provide supplemental briefing on the adequacy of the representation provided by the Souths and their counsel. Both the Rule 23.1 issues and the adequacy of representation issues were argued on August 3, 2012.

## II. RULE 23.1

■■■ When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved. *See* 8 *Del. C.* § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than share-holders, manage the business and affairs of the corporation." *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984). "Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata Corp. v. Maldonado,* 430 A.2d 779, 782 (Del.1981) (footnote omitted). Section 141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets. *See id.*

■■■ In a derivative suit, a stockholder seeks to displace the board's authority. *Aronson,* 473 A.2d at 811; *see also Desimone v. Barrows,* 924 A.2d 908, 914 (Del. Ch.2007) (noting that the issue for a Rule 23.1 motion is "whether the . . . board should be divested of its authority to address [the underlying] misconduct"). To do so, the complaint must allege with par-

sue preclusion, from both a logic and fairness standpoint, would not apply. *W. Coast Mgmt. & Capital, LLC v. Carrier Access Corp.,* 914 A.2d 636, 643 n. 22 (Del.Ch. 2006). Courts that have given preclusive effect to earlier Rule 23.1 dismissals have not embraced this distinction. *See, e.g., Sonus Networks,* 499 F.3d at 62–63 (giving issue preclusive effect where facts were not alleged in original complaint but original plaintiff could have obtained the information); *Arduini ex rel. Int'l Game Tech. v. Hart,* 2012 WL 893874, at *3 (D.Nev. Mar. 14, 2012) (noting that "Plaintiff's arguments that he has allegations specific to the demand futility issue that are different from the allegations brought up in [the underlying proceeding do not] preclude our use of issue preclusion"); *In re Bed Bath & Beyond Deriv. Litig.,* 2007 WL 4165389, at *6 (D.N.J. Nov. 19, 2007) (applying preclusive effect to different claims regarding different time periods); *LeBoyer v. Greenspan,* 2007 WL 4287646, at *2 (C.D.Cal. June 13, 2007) (applying preclusive effect to all possible claims relating to restatement, whether or not previously pled).

4. *See, e.g., Sonus Networks,* 499 F.3d at 64 ("[T]o bind the corporation, the shareholder plaintiff must have adequately represented the interests of the corporation."); *Henik,* 433 F.Supp.2d at 381 ("It should be noted that there may be grounds warranting a different preclusion analysis and result where the plaintiff shareholder in the first action is alleged to have inadequately represented the interests of all of the shareholders."); *Hanson,* 2007 WL 5186795, at *6 ("[C]ollateral estoppel is improper where the interests of nonparty plaintiffs facing preclusion were not adequately represented in the prior litigation."); *Career Educ.,* 2007 WL 2875203, at *10 ("Where a plaintiff alleges that the interests of the corporation were not suitably represented in the prior proceeding collateral estoppel may not apply."). *See generally* Restatement (Second) of Judgments § 42 (1982) ("A person is not bound by a judgment for or against a party who purports to represent him if . . . [t]he representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent.").

ticularity that the board was presented with a demand and refused it wrongfully or that the board could not properly consider a demand, thereby excusing the effort to make demand as futile.

The plaintiffs concede that they "have not made any demand on the Board." Compl. ¶ 45. Consequently, they must meet Court of Chancery Rule 23.1's heightened pleading standard, which requires that a complaint allege "with particularity ... reasons for the plaintiff's failure to obtain the action or for not making the effort." Ch. Ct. R. 23.1. Demand is futile when "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. The plaintiffs do not allege that any particular director in office at the time of the filing of the complaint made a specific decision challenged in the complaint, so the more specialized two-part *Aronson* test does not apply. *Compare Aronson*, 473 A.2d at 814 (articulating two-part test where board composition did not change) *with Rales*, 634 A.2d at 933–34 (explaining that "[c]onsistent with the context and rationale of the *Aronson* decision, a court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit.").

As noted, the complaint attempts to plead a *Caremark* claim arising out of the unfortunate series of incidents at the Lucky Friday mine. A *Caremark* claim contends that the directors set in motion or "allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing

so they violated a duty to be active monitors of corporate performance." *Caremark*, 698 A.2d at 967. "A stockholder cannot displace the board's authority [over the corporation's claims] simply by describing the calamity and alleging that it occurred on the directors' watch." *Allergan*, 46 A.3d at 340. " '[M]ost of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention.' " *Stone*, 911 A.2d at 372 (quoting *Caremark*, 698 A.2d at 968). "[O]rdinary business decisions that are made by officers and employees deeper in the interior of the organization can ... vitally affect the welfare of the corporation and its ability to achieve its various strategic and financial goals." *Caremark*, 698 A.2d at 968. "[D]irectors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both...." *Stone*, 911 A.2d at 373.

To plead demand futility, a stockholder plaintiff must plead facts establishing a sufficient connection between the corporate trauma and the board such that at least half of the directors face "a substantial likelihood of personal liability." *Desimone*, 924 A.2d at 914. Without a connection to the board, a corporate trauma will not lead to director liability. Without a substantial threat of director liability, a court has no reason to doubt the board's ability to address the corporate trauma and evaluate a related demand.

A plaintiff can plead the necessary connection by alleging with particularity actual director involvement in a decision or series of decisions that violated positive law. "[I]mposition of liability requires a showing that the directors knew they were not discharging their fiduciary

obligations." *Stone*, 911 A.2d at 370. Because sophisticated and well-advised individuals like corporate directors do not customarily concede violations of positive law, a plaintiff must plead facts and circumstances sufficient for a court to infer that the directors knowingly did so. *See In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 965 A.2d 763, 777, 795 (Del.Ch.2009).

 A plaintiff who cannot point to facts supporting such a decision can plead that the board consciously failed to act after learning about evidence of illegality—the proverbial "red flag." A plaintiff might plead, for example, that the directors

ignored "red flags" indicating misconduct in defiance of their duties. A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning.

*David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006) (footnote omitted). A board that fails to act in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act. *See Aronson*, 473 A.2d at 813 (equating "a conscious decision to refrain from acting" with a decision to act); *accord Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del.Ch. Jan. 14, 1991).

 If there is no evidence of direct board action or conscious inaction, then the plaintiff might seek to plead "that a board of directors is dominated or controlled by key members of management, who the rest of the board unknowingly allowed to engage in self-dealing transactions." *Shaev*, 2006 WL 391931, at *5 n. 11. Typically, however, the plaintiff must fall back to the final means of connecting the directors to illegality: the board's obligation to adopt internal information and reporting systems that are "reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance." [5] If a corporation suffers losses proximately caused by illegal conduct, or if the directors failed "to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists," then there is a sufficient connection between the occurrence of the illegal conduct and board level action or conscious inaction to support liability. *Caremark*, 698 A.2d at 970.

 A plaintiff seeking to establish liability under this final route faces a pleading burden that "is quite high." *Id.* at 971.

Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, as in *Graham* [*v. Allis–Chalmers Manufacturing Co.*, 188 A.2d 125 (Del.1963) ] or in [the *Caremark* case itself], ... only a sustained or systematic failure of the board to exercise oversight—such as an utter

**5.** *Caremark*, 698 A.2d at 970; *see, e.g., Stone*, 911 A.2d at 364 (evaluating claim under failure-to-monitor branch of *Caremark* when "the plaintiffs acknowledge that the directors neither knew nor should have known that violations of law were occurring, *i.e.*, that there were no red flags before the directors" (alteration and internal quotation omitted)); *Shaev*, 2006 WL 391931, at *1 (evaluating claim under failure-to-monitor branch of *Caremark* after noting that the plaintiffs had no indications that the director defendants had any contemporaneous knowledge of the alleged misconduct by Citigroup employees).

failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability. *Id.* "Concretely, this latter allegation might take the form of facts that show the company entirely lacked an audit committee or other important supervisory structures, or that a formally constituted audit committee failed to meet." *Shaev*, 2006 WL 391931, at *5 (footnote omitted); *see Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch.2003) ("[T]he kind of fact pleading that is critical to a *Caremark* claim [includes] . . . contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation.").

## A. A Decision Violating Positive Law

 The Souths' complaint does not cite any statute, regulation, or other provision of positive law that the Board allegedly decided consciously to violate, nor facts from which such a decision could be inferred. The plaintiffs might have looked for evidence of such a decision by using Section 220 to obtain minutes and related materials from Board and Safety Committee meetings. Instead, the complaint relies on the November 2011 MSHA Report and January 2012 MSHA press release. Neither supports a reasonable inference that the Board consciously decided to violate positive law.

In the Overview section, the MSHA Report states that the April 2011 accident occurred because management "did not have policies and procedures that provided for safe mining of split stopes in a multi-vein deposit," "failed to design, install, and maintain a support system to

control the ground in places where miners worked and traveled," and "failed to ensure that appropriate supervisors or other designated persons examined or tested the ground conditions where the fall occurred." The MSHA Report does not equate "management" with the Board. The MSHA Report uses the term to refer to the "principal operating officials" for the Lucky Friday mine: Phil Baker, CEO; John Jordan, Vice–President; and Scott Hogamier, Safety Coordinator. *Id.* at 1. Under *Stone*, *Guttman*, and *Caremark*, it is not reasonable to infer that the Board acted in bad faith based on references to "management," particularly when the MSHA Report focuses on nuts-and-bolts operational issues.

Nor does the MSHA Report support a reasonable inference of conscious Board action or intentional inaction. Using language of omission, not commission, the MSHA Report notes that policies on certain safety issues were not in place. It would be too great a leap to infer that the directors engaged in affirmative wrongdoing or consciously abdicated their duties from the non-existence of the policies.

The MSHA press release also does not support a reasonable inference of conscious Board action or intentional inaction. The press release describes the results of inspections conducted by MSHA in December 2011. Compl. ¶ 38. It notes that MSHA had issued 59 citations and 15 orders to Hecla in connection with the December 2011 rock burst. *Id.* Each of the illustrative violations references a day-to-day operational issue in the Lucky Friday mine. None suggest a Board-level decision.

## B. Ignoring Red Flags

In their central argument, the plaintiffs contend that the unfortunate incidents at

the Lucky Friday mine amounted to "red flags" sufficient to put the Board "on notice" of safety issues. Compl. ¶¶ 5, 22. According to the complaint, despite those incidents, the Board "continued to ignore safety issues and utterly failed to foster compliance with and/or implementation of internal or external controls necessary to ensure mine safety in accordance with safety regulations." *Id.* ¶ 47. These allegations are not sufficient to establish a substantial likelihood of liability giving rise to demand futility.

Although the complaint asserts that the directors knew of and ignored the 2011 safety incidents, the complaint nowhere alleges anything that the directors were told about the incidents, what the Board's response was, or even that the incidents were connected in any way. *See In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del.Ch. Jan. 11, 2010) (declining to draw inference that prior, unrelated misconduct supported inference that board should have been on notice of potential wrongdoing); *In re Citigroup, Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 129 (Del.Ch.2009) (rejecting the contention that "alleged, prior, *unrelated* wrongdoing would make directors 'sensitive to similar circumstances' "). Here again, the Souths

might have used Section 220 to investigate what the directors knew and did, evaluate their theories of liability, and make an informed decision about whether or not to sue.

Rather than making particularized allegations about red flags and director knowledge, the plaintiffs argued that the members of the Safety Committee must have known about and consciously ignored the problems at the Lucky Strike mine because they were charged with overseeing safety. As numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1.[6] The existence of the Safety Committee and the scope of its charter are not sufficient to establish the necessary connection to the Board. They are more than sufficient to suggest appropriate areas for a stockholder to explore via a Section 220 request.

In their briefs and at oral argument, plaintiffs' counsel cited *In re Massey Energy Co. Derivative & Class Action Litigation*, 2011 WL 2176479 (Del.Ch. May 31,

---

6. *See, e.g., Wood v. Baum,* 953 A.2d 136, 142 (Del.2008) (rejecting allegation that service on Audit Committee was sufficient to support inference of knowing participation in illegal conduct); *In re Goldman Sachs Gp., Inc. S'holder Litig.,* 2011 WL 4826104, at *22–23 (Del.Ch. Oct. 12, 2011) (describing allegations about committee structure and holding that "the Plaintiffs do not plead with particularity anything that suggests that the Director Defendants acted in bad faith or otherwise consciously disregarded their *oversight* responsibilities in regards to Goldman's business risk"); *Citigroup,* 964 A.2d at 126–28 (rejecting as insufficient allegations based on directors' membership on Audit & Risk Management Committee and status as financial experts); *Rattner v. Bidzos,* 2003 WL 22284323, at *12–13 (Del. Ch. Oct. 7, 2003)

(rejecting inference that directors who were alleged to have served on Audit Committee therefore faced "a substantial likelihood of liability for failing to oversee [the company's] compliance with required accounting and disclosure standards"); *Desimone,* 924 A.2d at 938 (holding allegation that directors served Compensation Committee and administered stock option plan "does not suggest in any way that the Compensation Committee was involved in or had knowledge of any backdating"); *id.* at 940 (holding that allegations about extensive backdating of stock options did not support inference "that [the corporation's] internal controls were deficient, much less that the board, the Audit Committee, or [the corporation's] auditors had any reason to suspect that they were or that backdating was occurring").

2011), for the proposition that ignoring mining safety violations could give rise to a *Caremark* claim. Certainly it could. But *Massey* was not a pleadings-stage ruling. Chancellor Strine addressed the *Caremark* claim in the process of denying an application for a preliminary injunction after development of a substantial discovery record. Plaintiffs' counsel could not cite a single decision in which a court had inferred knowledge of wrong-doing or conscious indifference to alleged red flags under circumstances paralleling the plaintiffs' complaint, where the complaint's allegations did not attempt to set forth facts suggesting conscious indifference. Tr. 35–36.

Ultimately, plaintiffs' counsel was forced to retreat during oral argument to a more reductionist position: knowledge can be inferred because three safety incidents occurred within one year. Tr. 28–29. Like any simplistic bright-line rule, a three-incidents-in-a-year test would be easy to administer. And concededly the number three has a lot going for it. Three Graces. Three Fates. Three wishes from the djinni in Aladdin's lamp. It's the number of licks it takes to get to the center of a Tootsie Pop, and for fans of *Schoolhouse Rock*, it will always be a magic number. But three mining accidents in a year does not support a reasonable inference of board involvement, much less bad faith, conscious wrongdoing, or knowing indifference on the part of a board of directors, particularly where the incidents appear unrelated. In a large corporation engaged in a dangerous business, three incidents could readily happen in a single year because of decisions made and actions taken sufficiently deep in the organization for the board not to have been involved.

## C. A Sustained or Systematic Failure to Exercise Oversight

Finally, the Souths' complaint does not contain allegations from which a court could infer "a sustained or systematic failure of the board to exercise oversight— such as an utter failure to attempt to assure a reasonable information and reporting system exists." *Caremark*, 698 A.2d at 971. The complaint instead pleads affirmatively that the Board established a Safety Committee and charged the committee with (i) reviewing health, safety and environmental policies; (ii) discussing annually with management the scope and plans for conducting audits of the Company's performance in health and safety; (iii) reviewing and discussing with management any material noncompliance with health or safety laws and management's response to such noncompliance; and (iv) receiving and reviewing updates from management regarding the Company's health and safety performance. Compl. ¶ 21. The members of the Safety Committee were the four outside directors with the most mining industry experience (directors Bowles, Rogers, Stanley, and Taylor). These pled facts do not support an inference of an "utter failure to attempt to assure a reasonable information and reporting system exists," but rather the opposite: an evident effort to establish a reasonable system. *Caremark*, 698 A.2d at 971; *see Ash v. McCall*, 2000 WL 1370341, at *15 n. 57 (Del.Ch. Sept. 15, 2000) ("the existence of an audit committee . . . is some evidence that a monitoring and compliance system was in place"). The complaint thus "refutes the assertion that the directors" utterly failed to attempt to fulfill their oversight obligations. *Stone*, 911 A.2d at 372.

The plaintiffs' brief in opposition to the Rule 23.1 motion further recognizes that the Board did not utterly fail to monitor and address Hecla's safety concerns. According to the plaintiffs,

[e]very mining company has to balance the costs of operating safely and in com-

pliance with applicable federal safety and health regulations with the desire to maximize profits. The Board of Directors of Hecla Mining Company ("Hecla" or the "Company"), addressed this tension by constituting a Health, Safety, Environmental, and Technical Committee (the "Safety Committee"). The Safety Committee is expressly charged with monitoring and reviewing the Company's safety procedures as well as its compliance with applicable health, safety, or environmental laws. In 2011, however, it was exposed that the Safety Committee and the Hecla Board had failed to get this balance right as the Company experienced a series of accidents at its Lucky Friday mine that were caused by Hecla's repeated failure over a number of years to have adequate safety procedures in place.

Opp'n. Br. at 4. Directors who try to "get this balance right," *id.*, are protected by the business judgment rule, even if they fall short in the attempt. *See Massey Energy*, 2011 WL 2176479, at *20–21.

## D. Dismissal With Prejudice As To The Named Plaintiff

Because the complaint lacks particularized facts supporting a reasonable inference that a majority of the Board faces a substantial risk of liability, the Souths have not pled demand futility and their lawsuit is subject to dismissal under Rule 23.1. In *King II*, the Delaware Supreme Court suggested three options available to a trial court when confronted with a hastily filed derivative complaint that failed to pass muster under Rule 23.1 "One possible remedy for a prematurely-filed derivative action might be for the plenary court to deny the plaintiff 'lead plaintiff' status in such circumstances." 12 A.3d at 1151. That potential remedy is not available here, because only the Souths have sued in this Court. Likewise, no one has sought to stay or dismiss this case in favor of a competing action in a different forum where the stockholder plaintiff acted diligently.

The Supreme Court next suggested that "[a]nother (although more drastic) remedy for a derivative complaint brought prematurely and without prior investigation of facts that would excuse a pre-suit demand, would be for the plenary court to dismiss the derivative complaint with prejudice and without leave to amend as to the named plaintiff." Id. This is the consequence contemplated by Court of Chancery Rule 15(aaa), which provides that

> [i]n the event a party fails to timely file an amended complaint or motion to amend under this subsection (aaa) and the Court thereafter concludes that the complaint should be dismissed under Rule 12(b)(6) or 23.1, such dismissal shall be with prejudice (and in the case of complaints brought pursuant to Rules 23 or 23.1 with prejudice to the named plaintiffs only) unless the Court, for good cause shown, shall find that dismissal with prejudice would not be just under all the circumstances.

In light of Rule 15(aaa), the Souths were on notice that dismissal with prejudice as to the named plaintiff would be the likely consequence if the Rule 23.1 motion were granted.

The *King II* Court suggested that "[a] third possible remedy would be for the plenary court to grant leave to amend one time, conditioned on the plaintiff paying the defendants' attorneys' fees incurred on the initial motion to dismiss." 12 A.3d at 1151–52. Rule 15(aaa) implements this alternative by contemplating that a plaintiff may obtain leave to amend "for good cause shown" if the Court finds that "dismissal with prejudice would not be just under all the circumstances."

The Souths have not provided any reason why dismissal with prejudice would not be just under all the circumstances. Their brief in opposition to the motion to dismiss stated only that

> in the event the Court does not find that Plaintiffs have pleaded their demand futility allegations with sufficient particularity, the Plaintiffs respectfully request that the Court dismiss the Complaint without prejudice, so that the Plaintiffs may institute an action to inspect the books and records of the Company, pursuant to 8 Del. C. § 220, in order to bolster Plaintiffs' allegations of demand futility.

Opp'n. Br. at 17. Wholly missing was any explanation as to why the Souths did not use Section 220 before filing suit, as the Delaware Supreme Court has recommended repeatedly.

If the passage of time and the operation of the contemporaneous ownership requirement made it unlikely that another plaintiff would be available, then a single opportunity to amend with fee shifting to the defendants for the initial motion to dismiss could be warranted. If a statute of limitations bar loomed, permitting a new representative plaintiff and different counsel to intervene might be appropriate. In this situation, however, dismissal of the complaint with prejudice as to the Souths is a fitting consequence that does not seem likely to work any prejudice on the corporation. There are at least two stockholders who served Section 220 demands on Hecla and who appear to be proceeding (at least to date) in accordance with the best interests of the corporation and the recommendations of the Delaware Supreme Court. Dismissing the current complaint with prejudice as to the Souths comports with the expectations set by Rule 15(aaa) and "freshen[s] the litigation environment so other plaintiffs whose lawyers ... con-ducted a pre-suit investigation might feel that they could now lead the case." *King I*, 994 A.2d at 355.

## III. ADEQUACY OF REPRESENTATION

As noted, good faith disagreements exist over the extent to which a dismissal with prejudice as to the named plaintiff could have preclusive effect on the efforts of other stockholders to bring suit, including those stockholders who have attempted to use Section 220. After considering the Souths' pleading, it concerned me that if a different stockholder carefully investigated the events at the Lucky Friday mine, uncovered a meritorious claim, and wished to pursue it, the potential combination of a broad preclusion rule together with all-too-predicable results of the Souths' litigation strategy could bar the diligent stockholder from suing. The Delaware Supreme Court's decision in *King II* reflects similar concern about bright-line rules that could prevent the fair and meaningful consideration of derivative claims. The *King II* decision rejected as "overbroad" a rule "that would automatically bar a stockholder-plaintiff from bringing a Section 220 action *solely* because that plaintiff previously filed a plenary derivative suit." 12 A.3d at 1151. As discussed above, the Supreme Court instead suggested three non-preclusive remedies for the plenary court to consider. *See id.* at 1151–52. The first two remedies appear designed to give a different plaintiff the opportunity to pursue the derivative claims. *See id.* at 1151 (suggesting the plenary court either deny "lead plaintiff" status to the stockholder who failed to use Section 220, thereby allowing a different plaintiff to control the case, or "dismiss the derivative complaint with prejudice and without leave to amend as to the named plaintiff," implying that a different plaintiff should be able to

sue). The third appears designed to give the plaintiff who initially failed to use Section 220 one final chance. *See id.* at 1151–52 (suggesting that the plenary court "grant leave to amend one time, conditioned on the plaintiff paying the defendants' attorneys' fees"). Since *King II*, and consistent with the spirit of that decision, this Court has issued rulings in hastily filed derivative actions designed to avoid foreclosing the ability of other stockholders to investigate and pursue *bona fide* claims.[7]

■ In a representative action, a trial court has an independent and continuing duty to scrutinize the representative plaintiff to see if she is providing adequate representation and, if not, to take appropriate action. *See In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 955 (Del.Ch. 2010). Faced with the Souths' failure to use Section 220 and other indicia of a conflict-driven filing decision, I requested briefing and heard argument regarding the adequacy of the plaintiffs' representation.

## A. The Standard For Evaluating Adequacy Of Representation

■ "[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity." *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 129

(Del.Ch.1999). A plaintiff seeking to maintain derivative claims must show that she can meet her ongoing fiduciary obligations, including by satisfying the adequacy requirements implicit in Court of Chancery Rule 23.1. *Youngman v. Tahmoush*, 457 A.2d 376, 379 (Del.Ch.1983); *Katz v. Plant Indus., Inc.*, 1981 WL 15148, *1 (Del.Ch. Oct. 27, 1981). The requirement of adequate representation flows from the Due Process Clause of the United States Constitution and the protection it affords the non-parties on whose behalf the representative plaintiff purports to litigate. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Hansberry v. Lee*, 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *MCA, Inc. v. Matsushita Elec. Indus. Co.*, 785 A.2d 625, 635–36 (Del.2001); *Prezant v. De Angelis*, 636 A.2d 915, 923 (Del.1994). A judgment only can bind those non-parties if the named plaintiff has provided adequate representation "at all times." *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965; *see MCA*, 785 A.2d at 635; *Prezant*, 636 A.2d at 923–24.

■ "[A]nalysis of adequacy requirements is generally the same under Rules 23 and 23.1 as cases decided under Rule 23(a)(4), *i.e.*, the adequacy requirement of Rule 23, may be used in analyzing the adequacy requirements of Rule 23.1." *Fuqua*, 752 A.2d at 129 n. 2; *see Youngman*, 457 A.2d at 379. There is, however, one critical difference. In a class action, the plaintiff bears the burden of proving

---

7. *See, e.g., In re Wal–Mart Stores Inc., Del. Deriv. Litig.*, C.A. No. 7455–CS (Del. Ch. July 24, 2012) (TRANSCRIPT) (declining to appoint lead counsel where competing plaintiffs had filed *Caremark* claims hastily based on public news articles); *In re Berkshire Hathaway Inc. S'holders Litig.*, C.A. No. 6392–VCL, 2012 WL 929677 (Del. Ch. Mar. 19, 2012) (TRANSCRIPT) (dismissing derivative complaint without prejudice to avoid uncertainty over preclusive effect and preserve opportuni-

ty to bring a meaningful demand futility case); *La. Mun. Police Empls.' Ret. Sys. v. Page*, C.A. No. 7041–CS (Del. Ch. Feb. 6, 2012) (TRANSCRIPT) (staying Delaware derivative action in favor of earlier filed California case; declining to dismiss Delaware case because of likelihood that stockholders who filed hastily in California provided inadequate representation and possibility that a stockholder who used Section 220 might develop meaningful factual allegations and pursue the claims).

adequate representation. *See Dieter v. Prime Computer, Inc.*, 681 A.2d 1068, 1071 (Del.Ch.1996). Although the Delaware Supreme Court has not yet ruled on the issue, this Court's decisions hold that in a derivative action, "the defendant must show a substantial likelihood that the derivative action is not being maintained for the benefit of the shareholders." *Emerald P'rs v. Berlin*, 564 A.2d 670, 674 (Del.Ch. 1989); *accord Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *10 (Del. Ch. Oct. 10, 2006, revised Oct. 16, 2006); *Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *8 (Del.Ch. Feb. 22, 2006).

■■■ " 'Just what measure of representation is adequate is a question of fact that depends on each peculiar set of circumstances.' " *Revlon*, 990 A.2d at 955 (quoting *Guerine v. J & W Inv., Inc.*, 544 F.2d 863, 864 (5th Cir.1977)). "[A] court [must] consider any extrinsic factors which might indicate that a representative might disregard the interests of" those she seeks to represent. *Emerald P'rs*, 564 A.2d at 674.

Delaware decisions on the question of adequacy of a derivative plaintiff "are markedly fact-specific." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.02[b][1], at 9–31 to –32 (2012). Relevant factors include: (1) the existence of economic antagonisms between the plaintiff and those he would represent; (2) the nature of the remedy sought; (3) indications that the named plaintiff was not the driving force behind the litigation; (4) plaintiff's unfamiliarity with the litigation; (5) the existence of other litigation pending between plaintiff and defendants; (6) the relative magnitude of plaintiff's personal interests as compared with his interest in the derivative action itself; (7) plaintiff's vin-

dictiveness toward the defendants; and (8) the degree of support plaintiff receives from the stockholders he purports to represent.

*Id.* § 9.02[b][1], at 9–23 (footnotes omitted). The list "is not exhaustive." *Bakerman*, 2006 WL 3927242, at *11.

■■■ "[I]t is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1...." *Katz*, 1981 WL 15148, at *2; *see Alden*, 2006 WL 456786, at *8 ("A combination of these factors often forms the basis of a dismissal of a plaintiff as inadequate...."). Nevertheless, a strong showing as to one factor is sufficient if that factor "involve[s] some conflict of interest between the derivative plaintiff and the class." *Fuqua*, 752 A.2d at 130; *accord Bakerman*, 2006 WL 3927242, at *11; *Alden*, 2006 WL 456786, at *8.

## B. A Presumption Of Disloyalty

Recent Court of Chancery decisions have suggested an evidentiary presumption that a plaintiff who files a *Caremark* claim hastily and without using Section 220 or otherwise conducting a meaningful investigation has acted disloyally to the corporation and served instead the interests of the law firm who filed suit. *See Allergan*, 46 A.3d at 335–36; *Baca*, 2010 WL 2219715, at *5; *King I*, 994 A.2d at 364 n. 34. Evidentiary presumptions have two signature attributes: they are mandatory and rebuttable. A presumption is mandatory in the sense that if certain basic facts are established, the presumption requires the decision-maker to infer the existence of the presumed fact. A presumption is rebuttable in the sense that if the party opposing the presumption introduces sufficient evidence contrary to the presumed fact, then the decision-maker is permitted to find contrary to the presumed fact. *See*

Ronald J. Allen & Craig R. Callen, *Teaching "Bloody Instructions": Civil Presumptions and the Lessons of Isomorphism*, 21 Quinnipiac L.Rev. 933, 934 (2003) [hereinafter *Civil Presumptions* ]. Under Delaware Rule of Evidence 301, "[i]n all civil actions and proceedings not otherwise provided for by statute or by these Rules, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence." D.R.E. 301; *see Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 418 n. 19 (Del.2010) ("Delaware law does not embrace the 'bursting bubble' rule adopted by the Federal Rules of Evidence.").

■ When a stockholder rushes to file a *Caremark* claim without first conducting an adequate investigation to determine whether or not there is a connection between the corporate trauma and director action or conscious inaction, the stockholder acts contrary to the interests of the corporation but consistent with the interests of the plaintiffs' firm that files the suit. This recurring scenario supports a presumption that the plaintiff has acted disloyally and is not an adequate fiduciary for the corporation. *See Allergan*, 46 A.3d at 335–36; *Baca*, 2010 WL 2219715, at *5; *King I*, 994 A.2d at 364 n. 34.

The resulting presumption recognizes that when a plaintiff asserts a *Caremark*

claim, the plaintiff must plead a connection between the underlying corporate trauma and the board. This requirement differentiates a *Caremark* claim from other types of derivative actions in which a plaintiff challenges a specific and identifiable board decision. In such a case, a plaintiff may well be able to plead particularized allegations without using Section 220 that are sufficient to survive a Rule 23.1 motion to dismiss, for example by pleading that a majority of the directors were not independent and disinterested (as when directors vote on their own compensation)[8] or that the decision was not entitled to the protections of the business judgment rule (as when a transaction meets the onerous standard for waste).[9] For a *Caremark* claim, however, the connection to the board is neither readily apparent nor reasonably inferable from the occurrence of the corporate trauma.

The resulting presumption also recognizes that there usually will not be any need to rush when filing a *Caremark* claim. The claim typically seeks to obtain damages from directors for underlying harms and related litigation. When a corporation first announces a trauma, the underlying harms often still will be developing. Related regulatory proceedings and regulatory actions rarely will be resolved. This Court routinely stays *Caremark* claims that seek to shift losses from the

**8.** *See, e.g., Weiss v. Swanson*, 948 A.2d 433, 448 (Del.Ch.2008) (denying Rule 23.1 motion and permitting derivative claims to proceed despite plaintiffs' apparent failure to use Section 220 where complaint challenged directors' issuance of options to themselves); *Conrad v. Blank*, 940 A.2d 28, 38–41 (Del.Ch. 2007) (denying Rule 23.1 motion and permitting derivative claims to proceed despite plaintiffs' apparent failure to use Section 220 where a majority of the directors either received the challenged options themselves or made the decisions to grant the options).

**9.** *See, e.g., Citigroup*, 964 A.2d at 138 (denying Rule 23.1 motion and permitting derivative claims to proceed, despite plaintiffs' failure to use Section 220, but only with respect to claim for waste); *La. Mun. Police Empls.' Ret. Sys. v. Fertitta*, 2009 WL 2263406, at *8 (Del. Ch. July 28, 2009) (denying Rule 23.1 motion and permitting derivative claims to proceed, despite plaintiffs' failure to use Section 220, where transactions met standard for waste).

corporation to the defendant fiduciaries.[10]

A plaintiff who hurries to file a *Caremark* claim after the announcement of a corporate trauma behaves contrary to the interests of the corporation but consistent with the desires of the filing law firm to gain control of (or a role in) the litigation. The natural and logical inference from this recurring scenario is that the plaintiff is serving the interests of the law firm, rather than those of the corporation on whose behalf the plaintiff ostensibly seeks to litigate.

Under Delaware Rule of Evidence 301, the party opposing the presumption can (i) undermine it by producing evidence that calls into question the requisite facts giving rise to the presumption or (ii) rebut it by producing evidence directly contrary to the presumptive inference. *See* D.R.E. 301. A plaintiff could call into question the requisite facts giving rise to the inference of disloyalty by showing that the plaintiff did not file hastily and conducted a meaningful and thorough investigation. To be adequate, the investigation would have to address not only the merits of the corporation's claim, but also the connection between the trauma and the board, the critical issue on which a Rule 23.1 motion to dismiss the *Caremark* claim will turn. Alternatively, the plaintiff could rebut the inference itself by persuading the Court that filing the *Caremark* claim in that form and at that time, based on the investigation conducted, served the best interests of the corporation. The latter approach re-

quires showing not only that the filing did not harm the corporation, but rather that acting speedily *benefited the corporation* and not just the plaintiffs' law firm. Because the presumption shifts to the plaintiff not only the burden of production but also the burden of persuasion, the representative plaintiff therefore must establish the adequacy of the filing decision.

## C. Applying The Presumption

The circumstances surrounding the filing of this case gave rise to a presumption of disloyalty. In response, the plaintiffs failed to produce any evidence, much less persuasive evidence, to rebut either the requisite facts giving rise to the presumption or the resulting inference. To the contrary, the plaintiffs' counsel confirmed that he filed when he did because of the pressures described in the *Allergan* decision and the fear that plaintiffs who moved more quickly in Idaho might gain control of the suit. Tr. 44.

### 1. The Requisites For The Presumption

■ First, the plaintiffs filed hastily. Hecla issued the press release announcing lower estimated silver production for 2012 on January 11, 2012. MSHA issued its press release about the safety citations at the Lucky Friday mine on January 25. On February 1, the first of two securities class actions was filed. On March 1, the Souths filed this action, in which they

---

10. *See, e.g., Brenner v. Albrecht,* 2012 WL 252286, at *7 (Del.Ch. Jan. 27, 2012) (staying derivative indemnification proceeding pending outcome of securities class action); *Brudno v. Wise,* 2003 WL 1874750, at *5 (Del.Ch. Apr. 1, 2003) (granting stay "[g]iven that the overwhelming thrust of the Delaware Action complaint is a demand for indemnification largely for harm to be incurred by [the corporation] in the Federal Securities Action, the sensible ordering of events is for the Federal Securities Action to proceed first"); *see also Massey Energy,* 2011 WL 2176479, at *27 ("[T]he plaintiffs, as fiduciaries for other Massey stockholders, [should] be reluctant to prosecute the Derivative Claims they claim are so valuable until the direct claims against Massey are resolved.... Thus, the Derivative Claims should follow, rather than precede, the resolution of the key direct suits and regulatory proceedings.").

sought to recover damages on behalf of the corporation for both the underlying corporate harms and any damages from the federal securities action. The Souths thus filed less than two months after the initial press release and exactly one month after the first federal securities action was filed.

Next, the plaintiffs asserted *Caremark* claims. The complaint seeks to recover damages that the Company suffered and will suffer as a result of (i) the Lucky Friday mine closure, (ii) the decline in Hecla's stock price, and (iii) the federal securities litigation. In other words, the plaintiffs hurried to file a tag-along indemnification action grounded primarily on still-developing harms from the Lucky Friday closure and the far-from-resolved federal securities actions. The decline in Hecla's stock price is not even a derivative injury, and its inclusion evidences the lack of care with which the plaintiffs approached their lawsuit.

Critically, there was no reason to rush that would further the interests of the corporation. Pending the resolution of a motion to dismiss, the federal securities complaints were subject to the automatic stay imposed by the Private Securities Litigation Reform Act. *See* 15 U.S.C. § 78u–4(b)(3)(B). Those cases were not going forward, and at the time of argument, no briefing schedule had yet been established. Nor did the underlying harms—the accidents at the Lucky Friday mine—call for haste. During 2011, as those unfortunate incidents were occurring, no stockholder plaintiff filed suit. It was only the public announcement of the lowered projection for silver production and the filing of the federal securities complaints that spurred the Souths and other derivative plaintiffs into action.

Finally, and just as importantly, a deliberate and thorough pre-suit investigation, rather than haste, was required to further the interests of the corporation. *Caremark* claims are difficult to plead and harder to prove. Equally important, because the claims are premised on corporate liability, pursuing a *Caremark* claim during the pendency of the underlying litigation or governmental investigation may well compromise the corporation's position on the merits, thereby causing or exacerbating precisely the harm that the *Caremark* plaintiff ostensibly seeks to remedy. A well-motivated derivative plaintiff, genuinely concerned about the corporation's best interests, will consider these factors and act carefully, not precipitously.

Here, plaintiffs' counsel admittedly did not make use of Section 220. Nor did the complaint suggest "a period of deep reflection on the publicly available documents and the law." *King I*, 994 A.2d at 364 n. 34. The complaint's allegations appeared drawn entirely from public filings and press releases. The complaint lacked any factual allegations regarding internal board deliberations, director decision-making, or knowledge or involvement of the Hecla directors in the accidents at the Lucky Friday mine or the MSHA-mandated closure of the Silver Shaft to address accumulated debris. The link between these events and the directors is not self-evident, and the complaint in this case did not suggest a meaningful investigation by the plaintiffs or their counsel into whether there was a connection between the incidents and action or conscious inaction by the Board.

### 2. Plaintiffs' Efforts To Undermine Or Rebut The Presumption

██ The plaintiffs failed to respond to the presumption by introducing persuasive evidence that either (i) undercuts the presumption's requisites or (ii) counters the inference of disloyalty. In their briefs and at oral argument, the plaintiffs did not

meaningfully dispute that they filed hastily and asserted a *Caremark* claim in an effort to shift to Hecla's directors the still-developing losses from the incidents at the Lucky Friday mine. They rather attempted to salvage their position by arguing that they conducted a sufficiently meaningful investigation. Plaintiffs' counsel admitted that he spent at most "several hours" on the complaint and only consulted publicly available documents, but he asserted his clients wanted him to sue, wanted his firm to represent them, and wanted to litigate in Delaware. Tr. 41, 47. So he filed. *Id.*

The obvious problem with this response is the lack of any *entity-beneficial* reason for filing. When pressed, plaintiffs' counsel recognized that he just as easily could have served as counsel, advanced all of the allegations in the complaint, and sued in Delaware after using Section 220. Tr. 46–48. Critically, had the Souths used Section 220 before filing, then they could have evaluated meaningfully whether it made sense to attempt to displace the Board's statutory authority to address the fallout from the Lucky Friday mining incidents. If the books and records showed that the Board was not disabled, then the Souths and their counsel, considering the matter as self-appointed fiduciaries for the corporation, could have declined to sue. If the books and records suggested culpability on the part of the directors, then the Souths and their counsel would have been positioned optimally to file a complaint capable of surviving motion practice and yielding benefits for the corporation. From the entity's standpoint, conducting additional investigation and using Section 220 offered potential upside without downside. As self-appointed fiduciaries for the corporation, the Souths should have acted in the corporation's best interests.

Ultimately, plaintiffs' counsel candidly (and commendably) conceded that he filed quickly because of the pressures described in the *Allergan* decision. Tr. 44. Rather than acting in the best interests of the corporation, the Souths filed hastily because doing so served the interests of their attorneys. In my view, these circumstances support an inference of disloyalty and a finding of inadequacy. Consequently, the dismissal of the Souths' complaint should not have preclusive effect on the litigation efforts of more diligent stockholders, thereby fulfilling the Delaware Supreme Court's expectation that the dismissal only would be "with prejudice and without leave to amend *as to the named plaintiff.*" *King II*, 12 A.3d at 1151 (emphasis added).

## IV. CONCLUSION

The action is dismissed with prejudice as to the named plaintiffs. Costs are awarded to the defendants. **IT IS SO ORDERED.**