# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE LENDINGCLUB CORP. | ) | CONSOLIDATED |
| DERIVATIVE LITIGATION | ) | C.A. No. 12984-VCM |

## MEMORANDUM OPINION

Date Submitted: July 17, 2019
Date Decided: October 31, 2019

Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, RIGRODSKY & LONG, P.A., Wilmington, Delaware; Robert I. Harwood, Matthew M. Houston, HARWOOD FEFFER LLP, New York, New York; Brett D. Stecker, James M. Ficaro, THE WEISER LAW FIRM, P.C., Berwyn, Pennsylvania; *Counsel for Lead Plaintiffs Chaile Steinberg, William A. Blazek, and William Rhangos.*

Raymond J. DiCamillo, Eliezer Y. Feinstein, RICHARDS, LAYTON & FINGER, P.A., Wilmington Delaware; Adam S. Paris, Natalie Muscatello, SULLIVAN & CROMWELL LLP, Los Angeles, California; *Counsel for Defendants John C. Morris, Daniel T. Ciporin, Jeffrey Crowe, Mary Meeker, Scott Sanborn, Lawrence H. Summers, and Simon Williams.*

Raymond J. DiCamillo, Eliezer Y. Feinstein, RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; Jonathan D. Polkes, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Counsel for Defendant John J. Mack.*

Myron T. Steele, T. Brad Davey, Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Robert J. Liubicic, MILBANK LLP, Los Angeles, California; Scott A. Edelman, Adam Fee, Andrew Lichtenberg, MILBANK LLP, New York, New York; *Counsel for Defendant Renaud Laplanche.*

Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Charlene S. Shimada, Susan D. Resley, Lucy Wang, MORGAN, LEWIS & BOCKIUS LLP, San Francisco, California; Marc J. Sonnenfeld, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania; *Counsel for Defendant Carrie Dolan.*

William M. Lafferty, Susan W. Waesco, Sabrina M. Hendershot, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Diane M. Doolittle, QUINN EMANUEL URQUHART & SULLIVAN LLP, Redwood Shores, California; David M. Grable, Joseph C. Sarles, Jordan E. Alexander, QUINN

EMANUEL URQUHART & SULLIVAN LLP, Los Angeles, California; John Potter, QUINN EMANUEL URQUHART & SULLIVAN LLP, San Francisco, California; *Counsel for Nominal Defendant LendingClub Corporation.*

**McCORMICK, V.C.**

LendingClub Corporation operates an online platform that facilitates loans issued by third parties. The company then purchases the loans and sells them to investors based on the investors' preferred loan characteristics. In March and April 2016, LendingClub sold to an institutional investor $22 million in near-prime loans that did not meet the investor's instructions concerning loan characteristics. When whistleblowers alerted the company's board of directors, the board conducted an internal investigation with the assistance of independent outside counsel and a forensic auditor.

The internal investigation surfaced other problems. Two members of the board of directors, one of whom was the company's CEO and board Chairman, failed to disclose their personal investments in Cirrix Capital L.P. before the company invested $10 million in Cirrix. Also, certain valuation adjustments made by LendingClub's wholly-owned subsidiary, LC Advisors, LLC, were not consistent with generally accepted accounting principles such that LC Advisors exceeded the investment parameters of one of the funds it managed.

The LendingClub board promptly self-reported the misconduct to the U.S. Securities and Exchange Commission. Although the SEC's investigation resulted in a cease-and-desist order, the SEC issued a press release contemporaneously with the order praising the LendingClub board for self-reporting, thoroughly remediating, and cooperating with the SEC's investigation. As part of LendingClub's

remediation efforts, the board secured the departure of the employees involved (including the CEO and CFO), bifurcated the roles of CEO and Chairman to increase accountability, reviewed and ratified the Cirrix investment, and disclosed all transactions between LendingClub and Cirrix on its financial statements as related party transactions. The board also publicly disclosed the problems that prompted the internal investigation, the results of the internal investigation, and its remediation efforts.

Two groups of LendingClub stockholders commenced litigation in reaction to the public disclosures. The first stockholder group filed a securities class action in the U.S. District Court for the Northern District of California against the company, the former CEO and CFO, and members of LendingClub's board of directors. As to the director defendants, the complaint alleged violations of Section 11 of the Securities Act of 1933, which are essentially strict liability claims and do not require a showing of scienter. The complaint alleged that LendingClub's December 2014 registration statement contained misstatements in view of LendingClub's later-disclosed weaknesses in its internal controls.

The second group of stockholders commenced this derivative action claiming that LendingClub's board of directors breached its fiduciary duties. The complaint does not challenge the propriety of the remedial actions taken by the board. Rather,

2

the complaint asserts claims under *Caremark*,[1] contending that the LendingClub board made no good faith effort to put in place a system of controls or, in the alternative, that it consciously failed to monitor company operations and thus disabled itself from being informed of problems requiring its attention.

The defendants in this action have moved to dismiss the complaint pursuant to Court of Chancery Rule 23.1 for failure to plead demand futility. On a motion to dismiss under Rule 23.1, a court evaluates whether the complaint alleges with particularity facts sufficient to create a reasonable doubt that the board of directors in place at the time the complaint was filed could have impartially considered a pre-suit demand. To meet their pleading burden in this case, the plaintiffs' primary argument is that the majority of the demand board members were compromised because they faced a substantial likelihood of personal liability relating to the subject matter of the complaint. To prevail on a *Caremark* claim, however, a plaintiff must prove that the director defendants acted in bad faith. The complaint does not contain a single fact that would demonstrate bad faith on the part of the demand board members, who were lauded for self-reporting, investigating, and remediating the wrongdoing at the heart of this matter. This decision thus holds that the majority of the demand board members did not face a substantial likelihood of liability arising

---

[1] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

3

from the subject matter of the complaint at the time it was filed and grants the defendants' motion to dismiss.

## I.    FACTUAL BACKGROUND

The background facts come from the Consolidated Supplemented Verified Stockholder Derivative Complaint (the "Complaint") and the documents it incorporates by reference.[2]

### A.    The Company

LendingClub Corporation ("LendingClub" or the "Company") is a Delaware corporation with its principal place of business in San Francisco, California.  As an alternative to the traditional banking system, the Company owns and operates an online platform that facilitates loans.  The platform allows borrowers to apply for consumer, small business, and other types of loans using the LendingClub website, and the Company relies on its issuing bank partners to originate those loans.  The Company then purchases the loans from its bank partners and sells them to investors based on the investors' preferred loan term and credit characteristics.  Since its initial launch in 2007, LendingClub has facilitated approximately $16 billion in loans.  The

---

[2] C.A. No. 12984-VCM, Docket ("Dkt.") 131, Consolidated Suppl. Verified Stockholder Derivative Compl. ("Compl.").

4

Company filed a registration statement with the SEC and went public in December 2014.[3]

## B. The May 2016 Disclosures

In an SEC Form 8-K filed on May 9, 2016 (the "May 9 Form 8-K"),[4] the Company announced that LendingClub's Board of Directors (the "Board") had accepted the resignation of Chairman and CEO Renauld Laplanche, who is a defendant in this action. According to the May 9 Form 8-K, Laplanche's resignation followed an internal review of certain "material weaknesses" in the Company's internal controls.[5] The May 9 Form 8-K identified two primary material weaknesses.

The first identified material weakness involved the sale of non-conforming loans to an investor. In March and April of 2016, LendingClub sold to an institutional investor over $22 million in near-prime loans that did not meet the investor's express instructions as to certain desired loan characteristics. Certain LendingClub personnel were aware that the loans did not meet the investor's criteria.

---

[3] LendingClub Corp., Registration Statement (Form S-1) (December 10, 2014) ("Registration Statement"). The Court may consider the Registration Statement because the Complaint quotes from and thus incorporates it by reference. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).

[4] LendingClub Corp., Current Report (Form 8-K) (May 9, 2016) ("May 9 Form 8-K"). The Court may consider the May 9 Form 8-K because the Complaint quotes from and thus incorporates it by reference. *Wal-Mart Stores*, 860 A.2d at 320.

[5] May 9 Form 8-K at 2.

The Audit Committee learned of the sales in April 2016, and the Board created a subcommittee, assisted by independent counsel and a forensic auditor, tasked with investigating the transaction. The Company ultimately repurchased the loans at par and resold them at par to another investor. Because of the repurchase, the loans were recorded on the Company's balance sheet as secured borrowings at fair value. LendingClub was unable to recognize approximately $150,000 in revenue as a result. Three senior managers involved in the initial sales were given the choice to either be terminated or resign.

The second identified material weakness involved Board members failing to disclose issues relevant to the Company's investment in Cirrix, an entity formed in 2012 to invest in online marketplace loans, including those facilitated by LendingClub. As of December 31, 2015, Laplanche owned a two percent stake in Cirrix and another board member, Defendant John J. Mack, owned a ten percent stake. Laplanche increased his interest in Cirrix to eight percent sometime between January 1, 2016 and March 31, 2016, while Mack reduced his interest to eight percent within that period.

As Laplanche was increasing his investment in Cirrix, he approached the Board's Risk Committee—which comprised Defendants John C. Morris, Daniel T. Ciporin, Lawrence H. Summers, and Simon Williams—and proposed that LendingClub invest $10 million to acquire a fifteen percent limited partnership

6

interest in Cirrix. Laplanche did not disclose the fact that he and Mack had financial interests in Cirrix. The Risk Committee approved the investment, and LendingClub thereafter acquired a fifteen percent stake in Cirrix, notwithstanding the Company's public statement that it would not assume credit risk or use its own capital to invest in loans facilitated by the LendingClub marketplace. As of April 1, 2016, Laplanche, Mack, and LendingClub owned approximately thirty-one percent of Cirrix. Once the Board learned of Laplanche's omission, he was asked to resign. The May 9 Form 8-K informed LendingClub's stockholders that the Board would continue to take remedial action.

The disclosures in the May 9 Form 8-K made headlines. Several large institutional investors ceased purchasing loans from LendingClub. The Company's stock fell from $7.10 at the close of trading on May 6, 2016 to $4.62 at the close of trading on May 9, 2016. By May 13, LendingClub stock closed at $3.51 per share.

On May 16, 2016, the Company filed its SEC Form 10-Q for the first quarter of 2016.[6] The Form 10-Q made additional disclosures, including the fact that the Company had received a grand jury subpoena from the U.S. Department of Justice and had contacted the SEC. The Form 10-Q explained that the "material weakness" identified in the Form 8-K was the result of an aggregation of internal control

---

[6] LendingClub Corp., Quarterly Report (Form 10-Q) (May 26, 2016) ("Form 10-Q"). The Court may consider the Form 10-Q because the Complaint quotes from and thus incorporates it by reference. *Wal-Mart Stores*, 860 A.2d at 320.

7

deficiencies caused by senior management's improper "tone at the top."[7]  To address these concerns, the Company requested the resignations of the senior managers involved, requested the resignation of Laplanche as CEO and Chairman of the Board, and bifurcated the roles of CEO and Chairman by appointing Defendant Scott Sanborn (who also serves as the Company's President) and Morris to those positions, respectively.

The Form 10-Q further explained that the Risk and Audit Committees were not fully aware of Laplanche's and Mack's Cirrix interests when the Company's Cirrix investment was approved.  At no point did Laplanche or Mack disclose their respective interests in Cirrix to the Board's Audit Committee or Risk Committee. Neither Laplanche nor Mack disclosed their respective interests in Cirrix in their annual director questionnaires.  The Form 10-Q concluded that the Company's controls were not effective to ensure that information about related party investments would be adequately conveyed to the relevant Board committees on a timely basis. Ultimately, when the Audit Committee learned of Laplanche's omission in late April 2016, it decided to disclose all transactions between LendingClub and Cirrix as related party transactions in the Company's quarterly financial statements.  On May 15, 2016, after Laplanche's resignation, the Audit Committee ratified

---

[7] Form 10-Q at 59–61; Compl. ¶ 134.

8

LendingClub's and Mack's respective investments in Cirrix as related party transactions.

### C. The Securities Class Action

In response to LendingClub's May 2016 disclosures, stockholders of the Company filed two securities class actions in the U.S. District Court for the Northern District of California. The federal court consolidated those actions under the caption *In re LendingClub Securities Litigation* (the "Securities Class Action"). The Securities Class Action named as defendants LendingClub, former LendingClub CFO Carrie Dolan (who is also a Defendant in this case), Laplanche, and several members of the Board during the relevant period.[8] The complaint alleged that all of the named defendants violated Section 11 of the Securities Act of 1933.[9] It further alleged that LendingClub, Laplanche, and Dolan violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder.[10] The complaint did not allege that the director defendants violated Section 10(b) or Rule 10b-5.[11]

---

[8] The Board at that time comprised Ciporin, Sanborn, Mack, Morris, Summers, Williams, Jeffrey Crowe, Mary Meeker, and Rebecca Lynn. With the exception of Lynn, each of these individuals is a named defendant in this action.

[9] *In re LendingClub Secs. Litig.*, 3:16-cv-03072-WHA, Order Re Mot. to Dismiss Consolidated Compl. ("Securities Class Action Order") at 6:6–7, ECF No. 29 (N.D. Cal. May 25, 2017) (ORDER).

[10] *Id.* at 6:8–10.

[11] The Securities Class Action complaint also alleged that Laplanche, Dolan, and the director defendants violated Section 15 of the Securities Act of 1933 and that LendingClub,

9

The Section 11 claims were premised on the allegation that LendingClub's December 2014 registration statement contained untrue statements or omissions of material fact regarding "(i) the weaknesses in LendingClub's internal controls, (ii) LendingClub's relationship with Cirrix, (iii) the adequacy of [LendingClub's] loan-approval process, and (iv) the adequacy of [LendingClub's] data integrity and security protocols."[12]

On May 25, 2017, the federal court granted in part and denied in part the defendants' motions to dismiss for failure to state a claim in the Securities Class Action. The court addressed each of the plaintiffs' four Section 11 claims against the named director defendants. It observed that Section 11 liability requires a plaintiff to show only that "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact."[13] The court further noted that plaintiffs asserting claims under Section 11 typically "need not prove . . . that the defendant acted with any intent to deceive or defraud."[14] The court ultimately sustained three of the Section 11 claims against the director

---

Laplanche, and Dolan violated Section 20(a) of the Securities Exchange Act of 1934. *Id.* at 6:7–11.

[12] *Id.* at 6:28–7:4.

[13] *Id.* at 6:20–23 (quoting 15 U.S.C. 77(k)(a)).

[14] *Id.* at 7:9–11 (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1333 (2015)).

defendants,[15] but it dismissed the claim alleging misstatements concerning LendingClub's loan approval process.[16]

The court denied the defendants' motion to dismiss the first 10b-5 claim—that Laplanche and Dolan made misrepresentations about several material weaknesses in LendingClub's financial reporting internal controls—because Laplanche and Dolan could not "escape allegations of scienter."[17] The court then allowed the plaintiffs' second 10b-5 claim—that Laplanche and Dolan failed to disclose the Cirrix-LendingClub relationship—to proceed as to defendant Laplanche, since Laplanche "knew about his relationship with Cirrix and his company's relationship and the misleading nature of failing to disclose that relationship."[18]

More than a year after the order regarding the motion to dismiss, the federal court approved a final settlement in the Securities Class Action totaling $125 million plus interest.[19] The order approving the settlement stated that the lead plaintiff in

---

[15] *Id.* at 21–22.

[16] *Id.* at 17:10–15.

[17] *Id.* at 19:8–25.

[18] *Id.* at 20:14–16. The court granted the defendants' motion to dismiss with regard to this claim against Dolan, since "there [were] no particularized allegations that CFO Dolan knew or should have known of [Laplanche's and Mack's ownership interest in Cirrix]." *Id.* at 20:19–21.

[19] *In re LendingClub Secs. Litig.*, 3:16-cv-02627-WHA, Order Granting Mot. for Final Approval of Settlement at 3:11–12, ECF No. 383 (N.D. Cal. July 20, 2018) (ORDER).

11

the action faced risks with continued litigation because the "defendants were actively developing the argument that LendingClub's internal control issues were nonexistent at the time of the IPO."[20]  All in all, the settlement comprised "approximately 17 percent of the estimated $711 million in recoverable damages at trial," and the court found that it was fair and reasonable.[21]  All of the defendants "denied and continue[d] to deny all charges of wrongdoing or liability against them" in the Securities Class Action,[22] and the plaintiffs agreed on behalf of the class to release claims against the defendants arising out of the facts alleged in the Securities Class Action.[23]  Accordingly, at present, none of the director defendants in this case are at risk of any liability arising from the Securities Class Action.

## D.    The June 2016 Disclosures

On June 28, 2016, the Company filed another SEC Form 8-K (the "June 28 Form 8-K") disclosing further accounting and compliance issues relating to the Company's wholly owned subsidiary, LC Advisors.[24]  LC Advisors is a registered investment advisor to certain private funds and accredited investors, and is thus

---

[20] *Id.* at 3:21–23.

[21] *Id.* at 3:12–13, 4:21–24.

[22] *In re LendingClub Secs. Litig.*, 3:16-cv-02627-WHA, Stipulation of Settlement at 5:20–21, ECF No. 333-1 (N.D. Cal. Feb. 21, 2018).

[23] *Id.* at 10:9–11, 20:11–14.

[24] LendingClub Corp., Current Report (Form 8-K) (June 28, 2016).  The Court may consider the June 28 Form 8-K because the Complaint quotes from and thus incorporates it by reference.  *Wal-Mart Stores*, 860 A.2d at 320.

subject to regulatory and legal requirements—including those imposed under the Investment Advisers Act of 1940 (the "Advisers Act"). LendingClub controlled LC Advisors through an Investment Policy Committee whose three members were Dolan, Laplanche, and the Company's former general counsel.

The June 28 Form 8-K explained that the Company chose to review LC Advisors' asset valuation methodologies with respect to six particular funds it managed. Because there was no quoted market price for the investment assets held by those funds, LC Advisors determined the funds' fair value using its own estimates and calculations. The Company determined that adjustments made to the valuation of those assets were not consistent with generally accepted accounting principles. It further determined that LC Advisors exceeded the investment parameters of one of the funds. To alleviate concerns regarding these events, the Company: (1) stated that it would reimburse limited partners who entered or exited the funds and who were adversely impacted by the improper adjustments; (2) engaged an independent valuation firm to provide valuation services to the affected funds; and (3) established a majority independent governing board for the affected funds.[25]

---

[25] The June 28 Form 8-K also disclosed that thirty-two loans were made through the LendingClub platform to Laplanche and three of his family members in December 2009. The loans in question totaled more than $700,000 in originations and $25,000 in revenue. The Company found that the loans were issued in an effort by Laplanche to help increase reported platform loan volume for December 2009 but concluded that there were no other situations involving inappropriate loan origination. These loans are not the subject of any direct claims in this action.

### E. The 2018 SEC Order

Two years after the June 2016 disclosures, on September 28, 2018, the SEC issued an order instituting public administrative and cease-and-desist proceedings against LC Advisors, Laplanche, and Dolan (the "SEC Order").[26] The SEC Order made findings of fact concerning LC Advisors' misconduct and the roles Laplanche and Dolan played in that conduct. Ultimately, the SEC found that LC Advisors, Laplanche, and Dolan had willfully violated various sections of the Advisers Act and its accompanying regulations. Neither LendingClub nor any of the Company's directors—excluding Laplanche—were named as respondents in the SEC proceedings. The SEC found that both LendingClub and LC Advisors provided "significant cooperation" throughout the duration of its investigation and put forth "extensive" remediation efforts.[27] The SEC Order further acknowledged that LendingClub self-reported the problematic conduct it identified after the Board first initiated its review in May 2016.

---

[26] The Court may consider the SEC Order because the Complaint quotes from and thus incorporates it by reference. *Wal-Mart Stores*, 860 A.2d at 320. The SEC Order is attached to Plaintiffs' brief as Exhibit B. Dkt. 151, Pls.' Omnibus Opp'n Br. to Defs.' Mots. to Dismiss the Consolidated Suppl. Verified Stockholder Derivative Compl. ("Pls.' Answering Br.") Ex. B.

[27] Pls.' Answering Br. Ex. B. at 2, 10.

## F. This Litigation

On December 14, 2016, LendingClub stockholders filed this derivative action based on allegations related to the Company's May 2016 disclosures. While briefing was underway on a motion to stay, a second derivative action was filed on August 18, 2017. The Court consolidated the two actions in October 2017, and the lead plaintiffs—Chaile Steinberg, William A. Blazek, and William Rhangos ("Plaintiffs")—filed a consolidated complaint on December 1, 2017. After settlement efforts proved unsuccessful, Plaintiffs filed their consolidated supplemented complaint on January 8, 2019.

The Complaint names as defendants eight of the nine members of the Board when the initial complaint was filed: Morris, Mack, Ciporin, Crowe, Meeker, Sanborn, Summers, and Williams (the "Director Defendants"). The Complaint separately names as defendants Dolan and Laplanche (with the Director Defendants, "Defendants") and LendingClub as a nominal defendant.

Defendants moved to dismiss the Complaint on February 22, 2019. The parties fully briefed the motion,[28] and the Court heard oral argument on July 17, 2019.[29]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss the Complaint for failure to adequately plead demand futility under Court of Chancery Rule 23.1.[30] "A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[31] Because derivative litigation "impinges on the managerial freedom of directors," Rule 23.1 requires that stockholders exhaust their

---

[28] Dkt. 142, Director Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Consolidated Suppl. Verified Stockholder Derivative Compl. ("Dir. Defs.' Opening Br."); Dkt. 138, Def. Renauld Laplanche's Br. in Supp. of his Mot. to Dismiss Pls.' Consolidated Suppl. Verified Stockholder Derivative Compl. ("Laplanche Opening Br."); Dkt. 140, Def. Carrie Dolan's Opening Br. in Supp. of Mot. to Dismiss the Consolidated Suppl. Verified Stockholder Derivative Compl. ("Dolan Opening Br."); Dkt. 145, Nominal Def. LendingClub Corporation's Opening Br. in Supp. of its Mot. to Dismiss the Consolidated Suppl. Verified Stockholder Derivative Compl.; Pls.' Answering Br.; Dkt. 157, Director Defs.' Reply Br. in Supp. of Their Mot. to Dismiss the Consolidated Suppl. Verified Stockholder Derivative Compl. ("Dir. Defs.' Reply Br."); Dkt. 161, Def. Renauld Laplanche's Reply Br. in Further Supp. of his Mot. to Dismiss Pls.' Consolidated Suppl. Verified Stockholder Derivative Compl.; Dkt. 158, Def. Carrie Dolan's Reply Br. in Supp. of Mot. to Dismiss the Consolidated Suppl. Verified Stockholder Derivative Compl.; Dkt. 156, Nominal Def. LendingClub Corporation's Joinder in the Director Defs.' Reply Br.

[29] Dkt. 174, Oral Argument on Defs.' Mot. to Dismiss.

[30] Defendants also moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6). Because Defendants' Rule 23.1 argument is dispositive, this decision need not reach Defendants' alternative Rule 12(b)(6) argument.

[31] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 Del. C. § 141 (a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

16

intracorporate remedies before filing suit.[32]  In order to satisfy the Rule 23.1

mandate, stockholders must either demand that the board of directors pursue the

claim on behalf of the corporation, or allege that making demand on the board would

have been futile.[33]  Stockholders choosing to allege demand futility rather than make

pre-suit demand "must comply with stringent requirements of factual particularity

that differ substantially from . . . permissive notice pleadings."[34]   "Vague or

conclusory allegations do not suffice, rather the pleader must set forth particularized

factual statements that are essential to the claim."[35]

Delaware courts apply one of two tests in evaluating whether demand is futile.

As the Delaware Supreme Court has instructed:

> Demand futility under Rule 23.1 must be determined
> pursuant to either the standards articulated in *Aronson v.
> Lewis* or those set forth in *Rales v. Blasband*.  Under the
> two-part *Aronson* test, demand will be excused if the
> derivative complaint pleads particularized facts creating a
> reasonable doubt that "(1) the directors are disinterested
> and independent or (2) the challenged transaction was
> otherwise the product of a valid exercise of business
> judgment."  In *Rales v. Blasband*, this Court identified
> three circumstances in which the *Aronson* standard will
> not be applied: "(1) where a business decision was made
> by the board of a company, but a majority of the directors
> making the decision has been replaced; (2) where the

---

[32] *Id.*

[33] Ct. Ch. R. 23.1(a).

[34] *Brehm*, 746 A.2d at 254.

[35] *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 553205, at *4 (Del. Ch. Feb. 29, 2008) (citing *Brehm*, 746 A.2d at 254).

17

subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation." In those situations, demand is excused only where particularized factual allegations create a reasonable doubt that, as of the time the complaint was filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.[36]

The Complaint contains two causes of action. The first cause of action alleges that the Defendants breached their fiduciary duties in connection with (a) the Board's failure to implement internal controls at LendingClub, which resulted in allegedly false and misleading statements in the Company's public disclosures, (b) the Cirrix investment, and (c) the non-conforming loans.[37] The second cause of action alleges (d) that the Defendants breached their fiduciary duties by failing to monitor LC Advisors' compliance with federal law and oversee LC Advisors' risk management.[38] Properly understood, the subject of each of these causes of action is not a business decision of the board, but rather, alleged violations of the Board's

---

[36] *Braddock v. Zimmerman*, 906 A.2d 776, 784–85 (Del. 2006) (quoting *Aronson*, 473 A.2d at 814; *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).

[37] Compl. ¶¶ 186–88.

[38] *Id.* ¶ 194.

18

oversight duties under *Caremark*.[39]  Thus, the *Rales* standard governs the demand

futility inquiry.[40]

When conducting the *Rales* analysis, "[t]he operative question is whether the

Board could impartially consider the merits of a demand without being influenced

---

[39] The parties dispute the nature of these claims.  That dispute translates into a disagreement as to whether the *Aronson* or *Rales* test applies.  Plaintiffs describe these claims as challenging the directors' conscious failure to act affirmatively and thus subject to the *Aronson* standard.  Pls.' Answering Br. at 36.  Defendants interpret Plaintiffs' claims as *Caremark* claims subject to the *Rales* standard.  See generally Dir. Defs.' Opening Br. at 26–39.  Plaintiffs' description of their claims in briefing do not match up with Plaintiffs' claims as pled.  *See, e.g.*, Pls.' Answering Br. at 35.  Defendants' position better matches the nature of the allegations.

The outcome of this decision is the same regardless of which standard applies.  To meet their burden on demand futility under both *Aronson* and *Rales*, Plaintiffs must plead particularized facts sufficient to "impugn the ability of at least half of the directors in office when [they] initiated [their] action . . . to have considered a demand impartially." *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015).  The *Aronson* and *Rales* tests are "complementary versions of the same inquiry."  *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013); *see Baiera*, 119 A.3d at 67 n.131 (memorializing Chancellor Bouchard's view that "our jurisprudence would benefit . . . from the adoption of a singular test to address the question of demand futility"); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) ("[T]he *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination.").  That inquiry is whether the board of directors in place at the time the complaint was filed was capable of "exercis[ing] its business judgment on the corporate behalf" and "validly consider[ing] a litigation demand." *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *14 (Del. Ch. Aug. 31, 2016); *China Agritech*, 2013 WL 2181514, at *16.  Plaintiffs have failed to meet their burden on this point for the reasons set forth in this Opinion.

[40] *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) ("For alleged violations of the board's oversight duties under *Caremark*, the test articulated in *Rales v. Blasband* applies to assess demand futility." (citing *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008))).

by improper considerations."[41] This analysis focuses on the board in place "as of the time the complaint was filed."[42] In this case, the board in existence at the time the complaint was filed comprised the eight Director Defendants and non-party Timothy Mayoloulos (the "Demand Board").[43] To meet their pleading burden, Plaintiffs must demonstrate that at least five of the nine directors serving on the Demand Board would have been incapable of exercising their independent and disinterested business judgment in responding to a pre-suit demand.

For the sake of argument, this decision assumes that Mack would have been incapable of impartially considering a pre-suit demand with respect to the subject matter of each of the four claims,[44] and evaluates Plaintiffs' arguments as to the other Demand Board members.

---

[41] *Pfeiffer v. Toll*, 989 A.2d 683, 689 (Del. Ch. 2010), *abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

[42] *Rales*, 634 A.2d at 934; *see also Aronson*, 473 A.2d at 810 (stating that demand futility is "gauged by the circumstances existing at the commencement of a derivative suit").

[43] *In re Fuqua Indus., Inc. S'holder Litig.*, 1997 WL 257460, at *13 (Del. Ch. May 13, 1997) ("The appropriate test, therefore, is whether the board in existence at the time the complaint is filed is able to properly carry out its fiduciary duty to evaluate demand in a disinterested and independent fashion."). Because the amendments and supplements to the initial complaint did not significantly alter the nature of the claims alleged, the operative date for this analysis is the December 14, 2016 filing of the original complaint. *Braddock*, 906 A.2d at 786. Plaintiffs do not dispute this. *See* Pls.' Answering Br. at 35 ("At the time this Action was commenced, there were nine directors on the Board: Defendants Morris, Mack, Ciporin, Crowe, Meeker, Sanborn, Summers, and Williams, and non-party director Mayoloulos . . . .").

[44] Mack's personal interests in Cirrix and failure to disclose that interest would arguably taint his ability to impartially consider claims challenging the Cirrix investment. His alleged personal relationship with Laplanche would arguably taint his ability to impartially

20

## A. Interestedness

A plaintiff can demonstrate interestedness by alleging particularized facts demonstrating that "a director has received, or is entitled to receive, a personal financial benefit from the challenged transaction"[45] or that the directors "face a 'substantial likelihood' of personal liability" relating to the subject matter of the complaint.[46] A "mere threat of personal liability" is not enough to challenge a director's disinterestedness.[47] Where, as here, the corporation's charter includes an exculpatory provision,[48] "a substantial likelihood of liability 'may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.'"[49] With the exception of Mack, Plaintiffs do not allege that any director derived a personal financial benefit from any of the challenged transactions.

---

consider a pre-suit demand concerning the other claims. This decision accepts these points for the sake of argument only and does evaluate at a granular level the sufficiency of the facts alleged in support of these arguments.

[45] *Rales*, 634 A.2d at 933 (quoting *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)).

[46] *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) (quoting *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995)).

[47] *Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 815).

[48] Dir. Defs.' Opening Br. Ex. 5, LendingClub Corporation Restated Certificate of Incorporation, at art. VII § 1 ("To the fullest extent permitted by law, no director of the Corporation shall be personally liable for monetary damages for breach of fiduciary duty as a director."). Certificates of incorporation are judicially noticeable. *In re Wheelabrator Techs. Inc. S'holder Litig.*, 1992 WL 212595, at *11–12 (Del. Ch. Sept. 1, 1992).

[49] *Baiera*, 119 A.3d at 62–63 (quoting *Wood*, 953 A.2d at 141).

They instead contend that a majority of the Demand Board faced a substantial likelihood of liability from this action and the Securities Class Action.

### 1. The Derivative Claims

This Court evaluates whether a substantial likelihood of liability impugns the impartiality of a demand board on a claim-by-claim basis.[50] As discussed above, the Complaint contains two causes of action effectively asserting four separate claims. The first cause of action alleges that the Defendants breached their fiduciary duties in connection with (a) the Board's failure to implement internal controls at LendingClub, which resulted in allegedly false and misleading statements in the Company's public disclosures, (b) the Cirrix investment, and (c) the non-conforming loans.[51] The second cause of action alleges (d) that the Defendants breached their fiduciary duties by failing to monitor LC Advisors' compliance with federal law and oversee LC Advisors' risk management.[52]

### a. Oversight of LendingClub

Plaintiffs' first claim is that the Director Defendants breached their fiduciary duties because "they failed to take steps to maintain adequate internal controls necessary to prevent against the issuance of false and misleading statements" at

---

[50] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) ("Demand futility analysis is conducted on a claim-by-claim basis.").

[51] Compl. ¶¶ 186–88.

[52] *Id.* ¶ 194.

22

LendingClub.[53]  These false and misleading statements allegedly surfaced in a variety of the Company's proxy statements, including in its December 2014 registration statement, where the Company stated that it would not "assume credit risk or use [its] own capital to invest in loans facilitated by [the LendingClub] marketplace"[54] and that it maintained "an effective information security program."[55]

This first claim calls for the application of *Caremark*, which sets out the "standard for liability for failures of oversight that requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith."[56]  *Caremark* articulates two categories of oversight claims: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[57]  "In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary

---

[53] *Id.* ¶ 188.

[54] *Id.* ¶ 79 (citing Registration Statement).

[55] *Id.* ¶ 83 (citing Registration Statement).  The Complaint cites numerous other proxy statements in which LendingClub allegedly made false and misleading statements, including statements about the Company's "transparency" with its borrowers and investors.  *Id.* ¶ 89 (citing LendingClub Corp., Annual Report (Form 10-K) (Feb. 27, 2015)).

[56] *Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003).

[57] *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

23

obligations."[58] As the Delaware Supreme Court recently explained: "[F]or a plaintiff

to prevail on a *Caremark* claim, the plaintiff must show that a fiduciary acted in bad

faith—'the state of mind traditionally used to define the mindset of a disloyal

director.'"[59]

---

[58] *Id.*

[59] *Marchand v. Barnhill*, 212 A.3d 805, 820–21 (Del. 2019) (quoting *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007)). The Delaware Supreme Court rendered its decision in Marchand approximately one month before oral argument, but after the parties had completed briefing on the motions to dismiss. The parties did not propose making supplemental submissions concerning the relevance of *Marchand*, nor did they mention *Marchand* at oral argument. *See generally* Dkt. 174, Oral Arg. on Defs.' Mots. to Dismiss. Regardless, *Marchand* does not change the outcome of this decision. The company involved in *Marchand* produced and distributed ice cream, thus operating in the "heavily regulated" food industry. 212 A.3d at 810. When a listeria outbreak at the company caused three deaths and other consequences, several stockholders filed a derivative lawsuit alleging violations of *Caremark*. *Id.* at 811. They alleged that, before the listeria outbreak, "no board committee that addressed food safety existed," despite food safety being "essential and mission critical" to the company. *Id.* at 822, 824. The complaint further alleged that "no regular process or protocols that required management to keep the board apprised of food safety compliance practices, risks, or reports existed," that "no schedule for the board to consider on a regular basis . . . any key food safety risks existed," and that "the board meetings [were] devoid of any suggestion that there was any regular discussion of food safety issues." *Id.* at 822. The Court held that "the complaint support[ed] an inference that no system of board-level compliance monitoring and reporting existed" at the company. *Id.* This case is readily distinguishable from *Marchand*. In this action, the Complaint concedes the existence of the Risk Committee and the Audit Committee. *See, e.g.*, Compl. ¶¶ 15, 18. It similarly concedes the former existence of the Investment Policy Committee as the supervisory committee for LC Advisors. *See, e.g.*, *id.* ¶ 108. And it notes that the Company had an "independent auditor." *Id.* ¶ 10. As the Delaware Supreme Court in *Marchand* observed: "In decisions dismissing Caremark claims, the plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants." 212 A.3d at 823. Plaintiffs lose here for that very reason.

Because Plaintiffs' first claim alleges a complete failure to maintain adequate internal controls, it falls within *Caremark*'s first category.[60] On that point, Delaware courts "give[] deference to boards and ha[ve] dismissed *Caremark* cases even when illegal or harmful company activities escaped detection, when the plaintiffs have been unable to plead that the board failed to make the required good faith effort to put a reasonable compliance and reporting system in place."[61]

To demonstrate interestedness, Plaintiffs argue that the majority of the Demand Board members faced a substantial likelihood of liability from their first claim.[62] This argument fails. The Complaint "is empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that the company lacked an audit committee [or] that the company had an audit committee that met only

---

[60] Plaintiffs dispute whether *Caremark* is the applicable standard, but regardless of how Plaintiffs seek to characterize their claims, the gravamen of the Complaint is that the directors failed to detect and prevent misconduct—in other words, that they failed in their duty of oversight. *See, e.g.*, Compl. ¶ 166 ("The Director Defendants' failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing, accounting, and risk controls were sufficiently robust and effective . . . constitute[s] breach[] of fiduciary duties . . . ."); *id.* ¶ 186 (alleging that the directors "failed to take steps to protect [LendingClub] from direct losses and the reputational damage stemming from permitting directors to secretly invest in funds that, in turn, invest in [LendingClub]"); *id.* ¶ 187 (alleging that the directors "failed to protect LendingClub from the damage stemming from permitting directors and officers to cause investments in client portfolios in contradiction to the client's express instructions"); *id.* ¶ 188 (alleging that the directors "failed to take steps to maintain adequate internal controls necessary to prevent against the issuance of false and misleading statements, as well as the other conduct alleged herein"). *Caremark* covers this.

[61] *Marchand*, 212 A.3d at 821 & n.105 (collecting cases).

[62] Compl. ¶ 166.

25

sporadically and devoted patently inadequate time to its work."[63] The factual allegations in the Complaint indicate that LendingClub's Audit Committee both (1) existed, and (2) met monthly.[64] The Complaint offers no facts concerning LendingClub's internal controls—or lack thereof—that would persuade a finding that the Board faced a substantial likelihood of liability for utterly failing to implement them. And the Complaint offers no factual support for a finding that a majority of the Demand Board acted in bad faith.

### b. Cirrix Investment

Plaintiffs' second claim is that Defendants breached their fiduciary duties by failing to prevent harm to the Company stemming from the Cirrix investment.[65] This claim falls within *Caremark*'s second category, since it alleges a conscious failure to monitor such that the personal ownership interests of Laplanche and Mack in Cirrix went undetected at the time the board approved the Cirrix investment.[66]

To recover under the second prong of *Caremark*, Plaintiffs must demonstrate that the directors, having implemented adequate internal controls, "consciously

---

[63] *Guttman*, 823 A.2d at 507.

[64] See Compl. ¶ 100 (describing the Audit Committee meeting of March 30, 2016); *id.* ¶ 101 (describing the Audit Committee meeting of April 26, 2016); *id.* ¶ 132 (describing the Audit Committee meeting of May 15, 2016).

[65] *Id.* ¶ 186.

[66] *See, e.g., id.* ¶¶ 117–18 (alleging that one of the "material weakness[es] in internal control over financial reporting" was the "'failure to disclose' issue directly involv[ing] Defendants Laplanche and Mack and their interests in Cirrix").

failed to monitor or oversee [their] operations thus disabling themselves from being informed of risks or problems requiring their attention."[67]

> Under this formulation of *Caremark*, a plaintiff may state a valid oversight claim by pleading (1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation. In practice, plaintiffs often attempt to satisfy the elements of a *Caremark* claim by pleading that the board had knowledge of certain "red flags" indicating corporate misconduct and acted in bad faith by consciously disregarding its duty to address that misconduct.[68]

In other words, Plaintiffs must allege that "the directors were conscious of the fact that they were not doing their jobs, and that they ignored red flags indicating misconduct."[69]

To demonstrate that this claim compromises the Demand Board for demand futility purposes, Plaintiffs argue that the Risk Committee members—Morris, Ciporin, Summers, and Williams—faced a substantial likelihood of liability for consciously failing to perform their duties in connection with the Cirrix Investment.[70] Plaintiffs argue that conscious disregard can be inferred because the

---

[67] *Stone*, 911 A.2d at 370.

[68] *Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) (first citing *Caremark*, 698 A.2d at 971; then citing *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012)).

[69] *Guttman*, 823 A.2d at 506.

[70] Pls.' Answering Br. at 46.

Risk Committee approved the Company's Cirrix investment at Laplanche's recommendation "without so much as questioning the propriety of the action or taking any steps to learn of Laplanche's and Mack's interests in Cirrix."[71]

This Court "has consistently found that just being a director on the committee where the alleged wrongdoing is 'within [its] delegated authority' does not give rise to a substantial threat of personal liability under *Caremark*."[72] Thus, Plaintiffs must make "supporting allegations of particularized facts showing bad faith" in order to show that the members of the Risk Committee did not have the ability to impartially consider pre-suit demand.[73] Plaintiffs have not met their burden on this point, as the Complaint does not plead such facts with particularity. However, there was significant overlap between the Audit and Risk Committees' membership—three of the members of the Audit Committee doubled as members of the Risk Committee.[74] The Complaint portrays the Audit Committee as having actively discussed the "significant and unusual non-routine" nature of the Cirrix investment.[75] The Risk Committee members, through their diligence on the Audit Committee, certainly

---

[71] *Id.* at 48.

[72] *In re China Automotive Sys. Inc. Deriv. Litig.*, 2013 WL 4672059, at *8 (Del. Ch. Aug. 30, 2013) (quoting *South*, 62 A.3d at 17).

[73] *Id.*

[74] Compl. ¶¶ 53, 55, 60.

[75] *Id.* ¶ 100.

seem to have "question[ed] the propriety" of the Cirrix investment, despite Plaintiffs' assertion to the contrary.[76] And, there are no facts indicating that the Risk Committee knew or should have known about Laplanche's and Mack's Cirrix investments. The Complaint affirmatively alleges that Mack and Laplanche did not disclose their Cirrix interests to the Board's Audit Committee or Risk Committee and did not list their Cirrix interests in their director questionnaires.[77]

Further, upon discovering Laplanche's and Mack's interests in Cirrix, the Audit Committee resolved that "all transactions between [Cirrix] and the Company will be disclosed as related party transactions in [the Company's] quarterly financial statements.[78] It then ratified the LendingClub-Cirrix and the Mack-Cirrix investments as related party transactions.[79] Plaintiffs do not plead facts sufficient to support a finding that a majority of the Demand Board consciously ignored red flags relating to the Cirrix investment such that it faced a substantial likelihood of liability in this action.[80]

---

[76] Pls.' Answering Br. at 48.

[77] Compl. ¶¶ 14, 134.

[78] *Id.* ¶¶ 18, 104.

[79] *Id.* ¶ 132.

[80] Although Plaintiffs do not cite to *In re Walt Disney Co. Derivative Litigation*, 825 A.2d 275 (Del. Ch. 2003), aspects of this claim resemble *Disney*. In any event, like *Caremark*, *Disney* also would require Plaintiffs to prove that Defendants acted in bad faith. *Disney*, 825 A.2d at 286. Thus, the demand futility analysis based on a likelihood of liability from this claim does not change even if *Disney* is applied.

### c. Sale of Non-Conforming Loans

Plaintiffs' third claim is that Defendants breached their fiduciary duties by failing to prevent the sale of non-conforming loans, either because they failed to implement board-level oversight mechanisms or consciously ignored red flags.[81] The legal standard applicable to this claim is the same as those applicable to Plaintiff's first and second claims.

In briefing, Plaintiffs do not make arguments specific to this claim in order to demonstrate that the Demand Board was compromised for demand futility purposes. The Complaint does not adequately allege that any of the Demand Board members acted in bad faith such that they faced a substantial likelihood of liability in connection with respect to the sale of non-conforming loans.

The Complaint does not allege that the Board utterly failed to implement an oversight mechanism to safeguard the integrity of loan data. Rather, the Complaint affirmatively alleges that, as of 2014, the Company "maintained an effective information security program" that "establishe[d] policies and procedures to safeguard the confidentially, integrity, and availability of borrower and investor information."[82] The program also involved "an incident response program and

---

[81] *Id.* ¶ 187.

[82] *Id.* ¶ 77 (quoting Registration Statement).

continuous monitoring and review."[83] Though the Company later admitted that deficiencies in this information security program allowed certain senior employees to alter loan data, these deficiencies do not point to an utter failure to oversee the Company.

Further, the Complaint contains no facts that speak to whether the Demand Board members knew or should have known of certain high-level employees' roles in the sale of non-conforming loans to an investor. Despite its conclusory allegation that "the Board did not take swift and decisive action commensurate with the disclosed misconduct,"[84] the facts alleged in the Complaint support the opposite conclusion. The Complaint explains that, upon discovering the sale of non-conforming loans, the Company took remedial steps such as asking for the resignations of the senior managers involved,[85] asking for the resignation of Laplanche as CEO and Chairman of the Board,[86] and bifurcating the roles of CEO and Chairman by appointing two different individuals—Sanborn and Morris, respectively—to those positions.[87] The Company additionally "conducted a review, under the supervision of a sub-committee of the board of directors and with the

---

[83] *Id.*

[84] *Id.* ¶ 120.

[85] *Id.* ¶ 113.

[86] *Id.* ¶ 114.

[87] *Id.* ¶ 115.

31

assistance of independent outside counsel and other advisors" including "forensic auditors,"[88] which led to its discovery of LC Advisors' missteps. There is no indication in the Complaint that a majority of the Demand Board acted in bad faith with respect to the sale of non-conforming loans such that it faced a substantial likelihood of liability in this action.

### d.    LC Advisors

Plaintiffs claim that the Defendants failed to oversee and monitor compliance of LC Advisors with applicable federal, state, and local laws, and likewise failed to oversee LC Advisor's risk management.[89] Plaintiffs concede that this claim calls for the application of *Caremark*.[90] More specifically, since this claim alleges an "utter[] and complete[]" failure to monitor and oversee LC Advisors, *Caremark*'s first prong applies.[91]

To demonstrate that this claim compromises the Demand Board for demand futility purposes, Plaintiffs allege that Demand Board failed to implement any mechanism by which it could oversee LC Advisors, despite the Company's acknowledgment in one of its 2015 SEC filings that any violations of law by

---

[88] *Id.* ¶¶ 7, 35.

[89] *Id.* ¶¶ 192–93.

[90] *See* Pls.' Answering Br. at 35.

[91] Compl. ¶ 194.

LC Advisors would affect LendingClub's ability to meet the demands of its online marketplace.[92]

The sole factual basis for Plaintiffs' claims—the SEC Order—undercuts Plaintiffs' argument that a majority of the Demand Board faced a substantial likelihood of liability in connection with a failure to oversee LC Advisors. The SEC Order makes no mention of the LendingClub board of directors, aside from its observation that the Board undertook remedial measures upon discovering LC Advisors' problematic conduct.[93] Plaintiffs' allegation that the Demand Board "identified a material risk to the Company and then inexplicably failed to monitor it"[94] is conclusory at best. While the Demand Board may have understood the importance of LC Advisors' compliance with federal law, Plaintiffs plead no facts sufficient to demonstrate that the Demand Board utterly failed to oversee LC Advisors' operations and thus face a substantial likelihood of liability with regard

---

[92] Pls.' Answering Br. at 45; Compl. ¶ 4 ("If our registered investment advisor, LC Advisors, LLC, were found to have violated the Investment Advisers Act, our ability to raise sufficient investor commitments to meet borrower demand could be impaired." (quoting LendingClub Corp., Annual Report (Form 10-K) (Feb. 22, 2016))).

[93] Pls.' Answering Br. Ex. B. at ¶ 43 ("Following a review initiated by LendingClub's board of directors in May 2016, LendingClub self-reported problematic conduct it identified.").

[94] Pls.' Answering Br. at 42.

thereto.  In fact, the Complaint reflects that the Board created the Investment Policy

Committee specifically for this purpose.[95]

According to the Complaint, the Investment Policy Committee did not

function as intended due to the conduct of two its three members—Laplanche and

Dolan.  When the Board learned of the relevant facts, the Board abolished the

Investment Policy Committee, which ultimately led to the establishment of a "new

governing board comprised of a majority of independent members . . . to supervise

---

[95] *See* Compl. ¶ 108 (explaining that the role of the Investment Policy Committee was to provide, among other things, compliance expertise "that helps ensure that clients' assets are properly managed given their stated investment goals"); id. ("LC Advisors disclosed that its [Investment Policy Committee] was responsible for overseeing the valuation process . . . .").  Plaintiffs further point to statements made by LendingClub counsel in a September 5, 2018 letter to the SEC. *In re LendingClub Asset Mgmt., LLC, SEC No-Action Letter*, 2018 WL 4660350 (Sept. 28, 2018) ("SEC No-Action Letter"); Compl. ¶ 171; Pls.' Answering Br. at 43.  The letter sought to preserve LendingClub's "ability to qualify as a 'well-known seasoned issuer'" under SEC rules.  SEC No-Action Letter, 2018 WL 4660350, at *2.  As one of its grounds for demonstrating good cause that LendingClub should not be deemed an ineligible issuer in light of LC Advisors' violations of law, the letter explained that the SEC Order—which had not yet been released—would not, among other things, "(iv) state that members of the [LendingClub]  board of directors . . . knew about the violations; or (v) state that members of the [LendingClub] board of directors . . . ignored any warning signs or 'red flags' regarding the violations." *Id.* at *4.  Plaintiffs pull this statement out of context and allege that this was "a clear admission the Board knew nothing about what was going on at LC Advisors, because it exercised no oversight regarding LC Advisors or the Investment Policy Committee."  Pls.' Answering Br. at 43.  But the Court does not interpret this particular cautious legal communication as an admission to that effect.

34

[LC Advisors'] exercise of its fiduciary duties."[96]  Since then, LC Advisors' new governing board "regularly makes reports to [LendingClub's] board of directors."[97]

Plaintiffs twist the meaning of these actions and argue that they show the Board "recognized the gravity of its failures and shut the barn door far too late."[98] This, too, is unpersuasive.  LC Advisors' misconduct occurred somewhere between December 2015 and April 2016.[99]  When that misconduct came to light in May 2016, the LendingClub Board began taking remedial action immediately.  And while it may be true that "actions taken after the fact do not absolve past transgressions,"[100] these allegations do not demonstrate that the Board failed to implement an oversight mechanism with regard to LC Advisors.  Rather, it demonstrates that the Board implemented an oversight system and, when the Board first learned that it was not working, created a new one.

### 2.    The Securities Class Action Claims

The analysis of whether the threat of substantial liability compromises a board's ability to consider a demand often focuses solely on the claims asserted in the derivative action itself.  But liability from another lawsuit "relating to the subject

---

[96] *Id.*

[97] *Id.*

[98] Pls.' Answering Br. at 44.

[99] SEC No-Action Letter, 2018 WL 4660350, at *5.

[100] Pls.' Answering Br. at 44.

matter of the complaint" also poses potential conflicts, as Vice Chancellor Laster explained in *Pfeiffer v. Toll*.[101] In that case, a majority of the directors on the demand board were defendants in a companion federal securities action that survived a motion to dismiss.[102] The Vice Chancellor found that demand was futile because it was not possible for the board to impartially consider a demand in light of the federal securities action. He reasoned that "[i]f the Company pressed forward with its rights of action against the defendants in this case the Company's efforts would undercut or even compromise the defense of the federal securities action."[103]

Relying on *Pfeiffer*, Plaintiffs here argue that seven of the nine Demand Board directors faced a substantial likelihood of liability for violations of federal securities laws arising from the same factual nexus as Plaintiffs' derivative claims in this action.[104] This argument is not relevant to Plaintiffs' second cause of action, since the Securities Class Action did not involve claims relating to LC Advisors. Rather, the only claims against the Director Defendants in the Securities Class Action were premised on the allegation that LendingClub's December 2014 registration statement contained misstatements or omissions regarding "(i) the weaknesses in

---

[101] 989 A.2d at 689 (citing *Guttman*, 823 A.2d at 503).

[102] *Id.* at 690.

[103] *Id.* ("[D]irectors can be compromised for purposes of considering a demand if they face a significant likelihood of liability relating to the subject matter of the complaint.").

[104] Compl. ¶ 163; Pls.' Answering Br. at 38–41.

36

LendingClub's internal controls, (ii) LendingClub's relationship with Cirrix, (iii) the adequacy of [LendingClub's] loan-approval process, and (iv) the adequacy of [LendingClub's] data integrity and security protocols."[105] These issues pertain to Plaintiffs' first cause of action only.

Defendants distinguish *Pfeiffer* because, in that case, the federal securities action had survived a motion to dismiss before the stockholder commenced a derivative action.[106] By contrast, in this case, Plaintiffs filed their initial derivative complaint in December 2016, nearly six months before the federal securities action had survived a motion to dismiss.[107] Defendants emphasize that demand futility "'is gauged by the circumstances existing at the commencement of a derivative suit' and not afterwards with the benefit of hindsight,"[108] and thus ask the Court to disregard the dismissal in the Securities Class Action on that basis.[109] Defendants' analytical framework is the correct one, and Delaware law instructs this Court to ignore events

---

[105] Securities Class Action Order at 6:28–7:4.

[106] Dir. Defs.' Opening Br. at 43–44.

[107] Dkt. 1, Verified Stockholder Derivative Compl; *see generally* Securities Class Action Order.

[108] *Hartsel v. Vanguard Gp.*, 2011 WL 2421003, at \*27 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012) (TABLE) (quoting *Aronson*, 473 A.2d at 810).

[109] Dir. Defs.' Opening Br. at 44.

subsequent to the filing of a derivative action for the purposes of a demand futility analysis.[110]

The Securities Class Action would not have compromised the Demand Board's ability to impartially consider a demand concerning the subject matter of this action, namely because the claims against them in this action are exceptionally weak. Distinguishing features of the two lawsuits further undermine Plaintiffs' argument. To hold the Director Defendants liable in this action, Plaintiffs must prove that the directors acted in bad faith—that is, there must be some factual support speaking to the Director Defendants' state of mind at the time the challenged conduct occurred.[111] By contrast, the Section 11 claims sustained against the Director Defendants in the Securities Class Action did not require a showing of scienter.[112]

---

[110] *Rales*, 634 A.2d at 934 (holding that the Court "determine[s] whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand" (emphasis added)).

[111] LendingClub's charter contains an exculpatory provision. Dir. Defs.' Opening Br. Ex. 5, LendingClub Corporation Restated Certificate of Incorporation, at art. VII § 1 ("To the fullest extent permitted by law, no director of the Corporation shall be personally liable for monetary damages for breach of fiduciary duty as a director."). Because Delaware law does not allow company charters to exculpate directors for breaching the duty of loyalty or for acting in bad faith, Plaintiffs must "plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper." *Wood*, 953 A.2d at 141; see 8 Del. C. § 102(b)(7).

[112] *Glaser v. Norris*, 1989 WL 78975, at *3 (Del. Ch. July 13, 1989); *see* Securities Class Action Order at 8:8–11 (suggesting that Section 11 claims are "strict liability" claims (quoting *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1028 (9th Cir. 2005))).

The only claims that required a showing of scienter in the Securities Class Action were the Section 10(b) and Rule 10b-5 claims asserted exclusively against Dolan and Laplanche. Liability under Section 11 would not, in and of itself, have gotten to the heart of whether the directors acted in bad faith concerning wrongdoing at issue in both actions. There is thus no basis for this Court to conclude that the Demand Board members would have viewed the Securities Class Action as posing a substantial likelihood of liability concerning the *Caremark* claims in this case.

For the same reasons, the federal court's decision to sustain the Section 11 claims in the Securities Class Action does not alter the analysis, because the Section 11 claims do not speak to the main ground in this case—the Director Defendants' good faith.[113] Moreover, if the Court considers the federal court's decision

---

[113] This conclusion is complicated somewhat by the fact that the federal court applied the Rule 9(b) pleading standard to all claims asserted in the Securities Class Action, including the Section 11 claims. The federal court's decision reflects two independent bases for this approach. First, the court stated that the Section 11 claims were "grounded in fraud" because they were rooted in the exact same factual allegations as the Section 10(b) claims. Securities Class Action Order at 7:15–16, 8:13–18. Under those circumstances, the court concluded that it was appropriate to review the Section 11 claims under a heightened pleading standard. *Id.* at 8:17–18. Second, the court cited to a rule of convenience, intimating that the strict liability Section 11 claims are the "lesser included" of the Section 10(b) claims. *Id.* at 8:7–12. Thus, if the Section 10(b) claims meet the heightened pleading standard, then the court need not separately review whether the Section 11 claims based on the same factual allegations meet the lesser standard. *Id.* at 8:19–20.

Because the court sustained the Section 11 claims as to the Demand Board members, one might deduce from the federal court's first basis for applying the Rule 9(b) pleading standard that the complaint adequately alleged claims that were grounded in fraud against the Demand Board members. A careful review of the dismissal decision, however, reveals no factual discussion concerning the Demand Board members' intent to deceive, with the exception of perhaps Mack. Rather, the discussion of wrongdoing focuses on Laplanche

39

sustaining certain claims against the Demand Board members, then there is no principled basis for ignoring the settlement of the Securities Class Action, which eliminated any threat of liability to the Demand Board members.

## B.  Independence

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[114]  "At [the motion to dismiss] stage, a lack of independence can be shown by pleading facts that support a reasonable inference that the director is beholden to a controlling person or 'so under their influence that their discretion would be sterilized.'"[115]

To meet their burden on this point, Plaintiffs must make allegations of control supported by facts demonstrating that, "through personal or other relationships[,] the directors are beholden to the controlling person"[116] such that "their discretion would

---

or Dolan.  Thus, it seems more reasonable to conclude that when sustaining the Section 11 claims alleged against the Demand Board members, the federal court followed the "lesser included" approach.

In any event, given the Demand Board members' strong position concerning their good faith conduct with respect to the wrongdoing at the heart of this action, the fact of the Securities Class Action does not alter the conclusion that the Demand Board would not have been compromised in responding to a pre-suit demand concerning the subject matter of the complaint.

[114] *Aronson*, 473 A.2d at 816.

[115] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *7 (Del. Ch. July 24, 2009).

[116] *Aronson*, 473 A.2d at 815.

be sterilized."[117]  "Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[118]  Though some professional or personal friendships "which may border on or even exceed familial loyalty and closeness" may undercut director independence, "[n]ot all friendships, or even most of them, rise to this level."[119]

On the question of independence, Defendants concede that Sanborn's status as CEO of the Company derogates his independence from the Board to whom he reports.[120]  This decision assumes that Mack is compromised.[121]  And Plaintiffs concede (at the pleading stage) the independence of Morris, Ciporin, Crowe, Williams, and Mayoloulos, by failing to assert argument as to these directors.

To impugn the independence of the remaining members of the Demand Board, Plaintiffs first allege that: (i) Meeker cannot independently consider a demand to bring claims implicating Mack because Meeker and Mack have "significant business and social ties"—namely, Mack was Meeker's former boss at

---

[117] *Rales*, 634 A.2d 927.

[118] *Beam*, 845 A.2d at 1050.

[119] *Id.* (quoting *Beam*, 833 A.2d at 979).

[120] Dir. Defs.' Opening Br. at 49.

[121] *See supra* note 44 and accompanying text.

Morgan Stanley;[122] and (ii) Summers lacks independence from Meeker because they both sit on the board of directors of Square Inc.[123] Because these arguments only implicate three of the nine Demand Board members, they would not defeat Defendants' motion even if accepted. Plaintiffs' challenges to Meeker's and Summers's independence fail in any event.

Plaintiffs allege that Meeker lacked independence from Mack because the two shared "significant business and social ties."[124] Specifically, the Plaintiffs argue that Mack and Meeker shared a "thirteen-year working relationship" by virtue of the fact that they both worked at Morgan Stanley "from at least 1997 through 2010."[125] The Complaint provides no facts indicating whether Mack and Meeker worked in the same office, held positions that required them to work together, or otherwise knew each other while working for Morgan Stanley. Plaintiffs, therefore, fail to allege particularized facts sufficient to support a finding that Meeker lacked independence from Mack.

Plaintiffs next argue that Meeker and Summers lacked independence from one another because they both serve as directors of another company called "Square,

[122] *Id.* ¶ 182.

[123] *Id.* ¶ 183.

[124] *Id.* ¶ 182.

[125] Pls.' Answering Br. at 50.

Inc.,"[126] but Plaintiffs do not explain the significance of this argument. Because Meeker and Summers stood independent with respect to the subject matter of the Complaint, their independence from one another is irrelevant. In any event, Plaintiffs offer no additional facts that speak to the alleged closeness of the relationship between Meeker and Summers, and this Court does not agree with Plaintiffs' conclusory allegation that the two cannot be considered independent because they served on the same board.

Plaintiffs cast a wide net in a final argument, contending that the *entire* Demand Board somehow lacked independence from Mack because it failed to exclude Mack from deliberations regarding the internal review of the Cirrix investment, terminate Mack, or require Mack to divest his Cirrix interests.[127] But none of these allegations, individually or collectively, suggest that the Demand Board members' personal relationships or other ties to Mack motivated this conduct or otherwise sterilized their discretion in considering a demand.[128]

---

[126] Compl. ¶ 183.

[127] *Id.* ¶¶ 176–79.

[128] This Opinion primarily considers the Defendants' Rule 23.1 arguments by reference to the Director Defendants' briefing. *See* Dir. Defs.' Opening Br. at 22–50; Dir. Defs.' Reply Br. at 6–34. The briefs of Dolan and Laplanche effectively adopt the Director Defendants' argumentation on this point. *See* Dolan Opening Br. at 5 ("As discussed in the Director Defendants' Motion to Dismiss, the Supplemented Complaint does not set forth particularized factual allegations sufficient to excuse pre-suit demand on the Board."); Laplanche Opening Br. at 11 ("Mr. Laplanche joins the arguments in the Directors' Brief that the Complaint should be dismissed pursuant to Rule 23.1 because Plaintiffs failed to make a demand on LendingClub's management, and failed to sufficiently allege demand

## III. CONCLUSION

In sum, Plaintiffs have failed to allege that a majority of the Demand Board members were unable to impartially consider pre-suit demand with regard to any of Plaintiffs' claims. Because the Complaint fails to meet the requirements of Rule 23.1, this decision does not address Defendants' arguments under Rule 12(b)(6). For the foregoing reasons, Plaintiffs' Consolidated Supplemented Verified Stockholder Complaint is DISMISSED.

---

futility."). Dolan correctly observes that, "regardless of the Director Defendants' ability to evaluate the claims against themselves personally, there is no question that the Board is entirely independent from Ms. Dolan" or faced a "substantial likelihood of personal liability for a claim against Ms. Dolan." Dolan Opening Br. at 6. Laplanche similarly emphasizes that "Plaintiffs' demand futility arguments are particularly deficient as to Mr. Laplanche given that he is no longer affiliated with the Company, and the Board therefore can independently and disinterestedly assess potential claims against him." Laplanche Opening Br. at 11–12. These arguments are persuasive and provide additional bases for dismissing the claims against Dolan and Laplanche.